**TOLEDO AREA AFL–CIO COUNCIL,**
etc., et al., Plaintiffs,

v.

Anthony G. PIZZA, etc.,
et al., Defendants.

No. 3:95 CV 7417.

United States District Court,
N.D. Ohio,
Western Division.

Aug. 22, 1995.

Stewart R. Jaffy, Stewart Jaffy & Associates, Columbus, OH, Theodore Sachs, Sachs, Kadushin, O'Hare, Helveston & Waldman, Detroit, MI, Jennifer L. Brunner, Brunner & Brunner, Columbus, OH, for plaintiffs.

Ralph C. Zychowicz, Jr., Office Of The Prosecuting Attorney, Toledo, OH, for Anthony Pizza, Lucas County, Ohio, Board of Elections.

Elise Porter, Office Of The Attorney General, Health and Human Services Section, Columbus, OH, Jeffrey S. Sutton, Diane R. Richards, Office Of The Attorney General, Chief Counsel's Staff, Columbus, OH, for Bob Taft, Ohio Elections Commission.

Janet Elizabeth Hales, Cooper, Straub, Walinski & Cramer, Toledo, OH, for Ohio Farm Bureau Federation and Ohio Chapter of the National Federation of Independent Business amicus curiae.

## MEMORANDUM OPINION

KATZ, District Judge.

This matter is before the Court on Plaintiffs' motion for a preliminary injunction and Defendants' opposition thereto. This Court has jurisdiction pursuant to 28 U.S.C. § 2201(a) in that an actual controversy exists entitling the Plaintiffs to a declaration of their rights with respect to the significant questions raised related to the validity of newly-enacted amendments to those sections of the Ohio Revised Code governing state regulation of political contributions and expenditures, otherwise known as the Ohio Campaign Finance Reform Act, as those sec-tions are impacted by the First and Fourteenth Amendments to the U.S. Constitution. Because this Court does not deem it necessary at this stage of the litigation to reach the issue raised in the complaint relating to 42 U.S.C. § 1983, jurisdiction respecting that statute is not discussed herein.

Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(1) and (2).

### BACKGROUND

*Parties*

Plaintiffs Toledo Area AFL–CIO council, the Ohio State AFL–CIO, American Federation of State, County and Municipal Employees ("AFSME"), and Seafarers International Union of North America are each voluntary, unincorporated labor associations. Plaintiff William Burga is President of the Ohio State AFL–CIO, while Plaintiff Dal Lawrence is President of the Toledo Area AFL–CIO council. Both individual plaintiffs sue in their official union and individual capacities.

Defendant Anthony G. Pizza is the Lucas County, Ohio, Prosecutor; Defendant Bob Taft is the Ohio Secretary of State. Additional Defendants are the Board of Elections of Lucas County, Ohio and the Ohio Elections Commission. Defendant Pizza is the public official responsible for prosecution of violations of the questioned statutes upon reference by the Board of Elections and/or Ohio Elections Committee; the Defendant entities have the responsibility to investigate irregularities, violations, etc. with respect to the impacted legislation and refer any such alleged violations to the appropriate prosecutorial authority for potential prosecution. Defendant Taft is the Chief election officer of the State of Ohio, whose duties include, *inter alia*, the administration of those sections of the Ohio Revised Code pertaining to political contributions and/or campaign finance regulation.

No objections have been raised with respect to the standing of any party. It, therefore, is clear that all parties Plaintiff have standing before this Court, and that all parties Defendant are appropriate parties in this action and are properly before the Court.

Further, all parties Plaintiff have in the past engaged in and represent that they will in the future engage in political conduct prohibited by various sections here in question, thus subjecting them to exposure to significant criminal penalties.

*Factual Background*

This action challenges the constitutionality of several sections of Ohio Amended Substitute Senate Bill No. 8 ("S.B. 8"), enacted by the Ohio legislature on April 25, 1995, signed by the Governor on May 24, 1995 and scheduled to become effective August 23, 1995. The several sections amend Ohio's statutory regulation scheme governing political contributions, solicitations and expenditures. Plaintiffs allege that there is no record or legislative history of actual or threatened corruption which led to these proposed reforms in campaign finance regulation. Rather, it is contended that the sole thrust of the new statutory provisions is significantly to restrict labor organizations, their agents and representatives in the exercise of their rights of political speech protected by the First Amendment, and in violation of their rights to Equal Protection under the Fourteenth Amendment. As a matter of fact, the Ohio legislature has no formal, or, to the Court's knowledge, informal legislative history; this makes inquiry into legislative intent outside the language of the statute an exercise in futility. Many cases cited by the parties turn on protecting a legitimate stated public interest which a state, state agency or local body addressed through legislation being analyzed for constitutionality by a Court. Such analysis is made difficult by the absence of legislative history in Ohio.

Plaintiffs seek declaratory and injunctive relief, including a preliminary injunction to bar enforcement of several provisions of the Ohio Revised Code intended to be amended by S.B. 8, to-wit: Sections 3517.082(B)(1) and (3); 3517.09(C); 3517.092(F)(1) and (2); 3517.102(D)(1); 3599.03(A) and (B); and 3599.031(H) and (I).

Defendants have responded that as to each section attacked by Plaintiffs there is ample legal justification and that none of the sections violate Plaintiffs' constitutional rights, including those granted by the First and Fourteenth Amendments to the U.S. Constitution. Further, Defendants deny that O.R.C. § 3599.03(I) is an unconstitutional abrogation of contracts, prohibited by Article I, Section 10 of the U.S. Constitution.

## MOTION FOR PRELIMINARY INJUNCTION

█ There are four factors which the Court must consider in determining whether a preliminary injunction should issue:

(1) the likelihood of plaintiff's success on the merits; (2) whether the injunction will save the plaintiff from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be served.

*International Longshoremen's Ass'n, Local Union No. 1937 v. Norfolk Southern Corp.* 927 F.2d 900, 903 (6th Cir.), *cert. denied,* 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 38 (1991). The four factors are not prerequisites to be met, but the Court must attempt to balance them. While the preliminary injunction standard is a flexible test, the finding of irreparable harm is essential. *Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100 (6th Cir.1982); *In re DeLorean Motor Co.,* 755 F.2d 1223, 1228 (6th Cir.1985).

A hearing was held on July 27, 1995 on a motion by Plaintiffs for a temporary restraining order sought to restrain Defendant Taft from pursuing another action. Defendant Taft filed an action in Common Pleas Court, Franklin County, Ohio, on July 21, 1995 (nine days after the filing of this case), seeking interpretation of the subject statutes under both Federal and Ohio Constitutions. This Court issued a temporary restraining order on July 28, 1995 enjoining Taft from pursuing the state Court action with respect to federal constitutional issues. Counsel for Defendant subsequently advised this Court that the state Court action in Franklin County was dismissed by action of the Judge, sua sponte. The temporary restraining order was, therefore, permitted to expire at the end of ten days.

The issues in this case have been fully briefed by the parties and a hearing was held on August 16, 1995, at which time both affi-

davit and live testimony was offered, and both sides presented oral argument in amplification of their respective positions. Additionally, an amicus brief has been filed and reviewed by the Court.

■ The Defendants continue to argue that this Court should abstain from ruling on the constitutionality of these provisions affecting significant First Amendment rights of the Plaintiffs; various reasons are advanced for such abstention. As noted on the record at the hearing on the motion for temporary restraining order, this Court does not agree that abstention is appropriate in this, a significant First Amendment case. Non-compliance with or violation of the questioned statutory provisions subjects the violator to consequential criminal liability. Further, the Sixth Circuit Court of Appeals has recently definitively held that where First Amendment rights are the subject of possible violation by state statute, a Federal District Court *should not* abstain from hearing the case and ruling on the issues raised. *G & V Lounge v. Michigan Liquor Control Comm'n*, 23 F.3d 1071 (6th Cir.1994).

Defendants have also urged the Court to abstain from ruling herein until after the adoption of regulations by Secretary of State Bob Taft. O.R.C. § 3517.15 directs the Secretary to adopt rules necessary for the enforcement and administration of, *inter alia,* the sections here at issue. Chapter 119 of the Ohio Revised Code provides, in brief, that the rules or regulations be submitted and a period of ninety days is provided for public hearings and comments. Counsel for Defendants have submitted to the Court for *in camera* inspection proposed administrative rules propounded by Secretary Taft pursuant to § 3517.15(A). The Court has reviewed pertinent portions of the *proposed* rules, including but not limited to the definitions of "Labor Organization", "Member", and "Affiliation", as well as that section which indicates who may be solicited for contributions to a labor organization's Ohio PAC. Those sections address several of the infirmities which appear in the statutes involved in this litigation, but exacerbate others. Irrespective of the propriety, appropriateness or impact of those proposed rules,

this Court finds that the interpretation of statutory provisions impacting on vital First Amendment rights, as well as the Equal Protection rights guaranteed by the Fourteenth Amendment (particularly those statutes which will take effect at a future date, as contrasted with the interpretation of existing statutes as to which rules and regulations may already be adopted), cannot be dependent upon administrative rules which are to be filed, and if so filed, may or may not be finally adopted in the form submitted. Therefore, a District Court should not abstain from hearing the issues before it and this Court will not abstain.

### EVIDENTIARY RULING

■ At the preliminary injunction hearing the Defendants moved the Court to bar the introduction of certain affidavits which Plaintiffs had filed. The reason clearly is the hearsay rule. It should be here noted that at the temporary restraining order hearing all counsel indicated the improbability of "live" testimony at the preliminary injunction hearing, but that each would file affidavits and/or deposition transcripts in support of their respective positions. Because ample facts exist on the record, particularly in Plaintiffs' verified complaint (as to which no denial or answer had been filed at the time of the commencement of the hearing), the Court indicated at the hearing it would grant Defendants' motion and strike several affidavits or parts thereof from the record. On further reflection, the Court reverses that ruling and overrules Defendants' motion to strike. The consideration of affidavits in a preliminary injunction hearing is significantly different from in a summary judgment motion; the latter generally involves the determination of whether there exists material issues of fact and whether in the absence thereof, the moving party is entitled to a judgment as a matter of law. In the preliminary injunction proceeding herein the issues are determined primarily on the law, they are not fact specific. The preliminary injunction hearing does not displace the trial nor result in an adjudication on the merits. That is the reason a Court, as stated by this Court at the hearing, may give even inadmissible evidence some weight. This Court's ruling is buttressed by

conclusions articulated in 11A Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 2949 (1995). Therefore, all affidavits submitted by all parties will be received for whatever value each may add to these proceedings.

### DISCUSSION OF INDIVIDUAL STATUTORY PROVISIONS

*A. O.R.C. § 3599.03(A) and (B)*

■ S.B. 8 amends § 3599.03 to add "labor organizations" and their officers, attorneys and agents to those entities prohibited from making direct political contributions. Corporations and nonprofit corporations continue to be so restricted.

The applicable sections follow:

(A) Except to carry on activities specified in sections 3517.092 and 3599.031 of the Revised Code and except as provided in divisions (D), (E), AND (F) of this section, no corporation, NO NONPROFIT CORPORATION, AND NO LABOR ORGANIZATION, directly or indirectly, SHALL pay, OR use, OR offer, advise, consent, or agree to pay or use, the corporation's money or property, OR THE LABOR ORGANIZATION'S MONEY, INCLUDING DUES, INITIATION FEES, OR OTHER ASSESSMENTS PAID BY MEMBERS, OR PROPERTY, for or in aid of or opposition to a political party, a candidate for election or nomination to public office, a political action committee, A LEGISLATIVE CAMPAIGN FUND, or any organization that supports or opposes any such candidate, or for any partisan political purpose, SHALL violate any law requiring the filing of an affidavit or statement respecting such use of THOSE funds, or SHALL pay or use the corporations's OR LABOR ORGANIZATION'S money for the expenses of a social fundraising event for its political action committee if an EMPLOYEE'S OR LABOR ORGANIZATION MEMBER'S right to attend such an event is predicated on the employee's OR MEMBER'S contribution to the corporation's OR LABOR ORGANIZATION'S political action committee.

Whoever violates division (A) of this section shall be fined not less than five hundred nor more than five thousand dollars.

(B) No officer, stockholder, attorney, or agent of A corporation OR NONPROFIT CORPORATION, NO MEMBER, INCLUDING AN OFFICER, ATTORNEY, OR AGENT, OF A LABOR ORGANIZATION, and no candidate, political party official, or other individual shall knowingly aid, advise, solicit, or receive money or other property in violation of division (A) of this section.

Whoever violates division (B) of this section shall be fined not more than one thousand dollars, or imprisoned not more than one year, or both.

(Language added by S B. 8 is capitalized).

As can be seen from a careful reading of these sections, union organizations are to be prohibited from making direct contributions "to a political party, a candidate for election or nomination to public office, a political action committee, a legislative campaign fund, or any organization that supports or opposes any such candidate, or for any partisan political purpose." Additionally, such organizations may not use their money to pay for the expenses of a social fund-raising event for its PAC if a union member's attendance is predicated upon that contribution. Corporations for profit and, in most instances, not for profit are likewise prohibited from such activities.

Plaintiffs urge this Court to invalidate the above-quoted sections because of infirmities when tested against the free speech and assembly rights guaranteed by the First Amendment and denial of equal protection under the Fourteenth Amendment. They rely heavily upon *Austin v. Michigan State Chamber of Commerce,* 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990). The *Austin* case involved the challenge of Michigan's Campaign Finance Act provision prohibiting all corporations from making direct contributions to or independent expenditures on behalf of candidates in state and local elections. The Chamber challenged disparate treatment, particularly when compared to unincorporated labor organizations not similarly restricted.

It has long been held that any restriction on the acknowledged right of free speech, including political speech, must both be justified by a compelling state interest and be narrowly drawn. There can be no question that the Michigan statute in *Austin*, as the Ohio statute here at issue, impinges upon the Plaintiffs' right to freedom of political speech. The Court in *Austin* found ample justification for that impingement with respect to corporate entities because the statute targeted "the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporations' political ideas." *Id.* at 660, 110 S.Ct. at 1397. In other words, the state had conferred a right to act in the corporate form and "articulated a sufficiently compelling rationale to support its restriction on independent expenditures by corporations." *Id.* at 660, 110 S.Ct. at 1398. While similar articulation is not apparent in Ohio due both to the wording of the statute and the lack of legislative history, this Court assumes that the Ohio legislators considered the same issues as did other state legislatures and Congress in adopting similar restrictions.

The Plaintiffs vigorously contend that the *Austin* Court's rejection of the Chamber's argument that the statute was underinclusive because it excluded unincorporated labor unions, mandates this Court's ruling that the reverse is prohibited; that is, the State may not include labor organizations within the statute prohibiting direct political contributions. Justice Marshall shunted aside the Chamber's argument for multiple reasons:

> Whereas unincorporated unions, and indeed individuals, may be able to amass large treasuries, they do so without the significant state-conferred advantages of the corporate structure; corporations are 'by far the most prominent example of entities that enjoy legal advantages enhancing their ability to accumulate wealth.' [*Federal Election Commission v.*] *MCFL*, 479 U.S. [238] at 258, n. 11, 107 S.Ct. [616] at 628, n. 11 [93 L.Ed.2d 539 (1986) ]. The desire to counterbalance those advantages unique to the corporate form is the State's compelling interest in this case; thus, ex-

cluding from the statute's coverage unincorporated entities that also have the capacity to accumulate wealth 'does not undermine its justification for regulating corporations.' *Ibid.*

> Moreover, labor unions differ from corporations in that union members who disagree with a union's political activities need not give up full membership in the organization to avoid supporting its political activities. *Although a union and employer may require that all bargaining unit employees become union members, a union may not compel those employees to support financially 'union activities beyond those germane to collective bargaining, contract administration, and grievance adjustment.' Communications Workers v. Beck*, 487 U.S. 735, 745, 108 S.Ct. 2641, 2648, 101 L.Ed.2d 634 (1988). See also *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) (holding that compelling nonmember employees to contribute to union's political activities infringes employees' First Amendment rights). *An employee who objects to a union's political activities thus can decline to contribute to those activities, while continuing to enjoy the benefits derived from the union's performance of its duties as the exclusive representative of the bargaining unit on labor-management issues.* As a result, the funds available for a union's political activities more accurately reflects members' support for the organizations's political views than does a corporation's general treasury. Michigan's decision to exclude unincorporated labor unions from the scope of § 54(1) is therefore justified by the crucial differences between unions and corporations.

*Austin*, 494 U.S. at pp. 665–666, 110 S.Ct. at 1400–1401 (Emphasis added).

The Ohio statute, like the Michigan statute, is modeled after a provision of the Federal Election Campaign Act of 1971 ("FECA") requiring *both* corporations and labor unions to use separate segregated funds to finance independent expenditures made in federal election campaigns. Such separate segregated funds refer primarily to voluntary contributions to corporate or union

political action committees ("PAC"). While the *Austin* Court justified the distinction between corporations and labor organizations, thus rationalizing *excluding* the latter from the prohibitions of the Michigan statute, nothing in that opinion indicates that the *inclusion* of labor organizations in such a statute would require this Court to hold that the statute violates the First or Fourteenth Amendments of the United States Constitution. Similarly, the inclusion of labor organizations in O.R.C. § 3599.03(A) and (B) does not mandate such a holding.

The Supreme Court in *Austin* addressed the issue of corporate uniqueness justifying the then effective Michigan statute; the fact that the FECA covered labor organizations as well did not escape Justice Marshall. (See footnote 4, *Austin, supra*). The Michigan statute has now been amended to mirror the FECA with respect to prohibiting direct political contributions, as does the new amendment to the Ohio statute. In a well-reasoned opinion earlier this year, Judge Paul D. Borman declared:

> The Supreme Court's upholding the restriction on corporations in the then MCFA § 54, does not impel conclusion that the restriction on unions in the now-MCFA § 54 violates the United States Constitution. This Court rejects the application of the maxim of legislature interpretation, *'inclusio unius est exclusio alterius'*—the inclusion of one (corporations) is the exclusion of all others (unions).

*Michigan State AFL–CIO, et al. v. Miller,* 891 F.Supp. 1210, 1214 (E.D.Mich.1995) (citations omitted).

While acknowledging that the *Austin* Court justified exclusion of labor unions and inclusion of corporations, this Court does not find that inclusion of labor unions in the prohibitions of O.R.C. § 3799.03(A) violates those organizations' rights of political free speech under the First Amendment or equal protection under the Fourteenth Amendment. Like the Michigan statute and the FECA, the subject Ohio statutes make appropriate accommodation for political contributions to be made through the use of separate segregated funds (SSF) and PACs.

Finally, it should be noted that this Court recognizes the multitude of cases which addressed this issue prior to *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) and its progeny, including *Austin.* While campaign contribution regulations have evolved slowly in Ohio, the subject statute is reflective of the FECA and, like the judgment of Congress, the judgment of the legislature should be disturbed only where not clearly constitutionally supported. As indicated by Justice Marshall in an opinion preceding the *Austin* case by some nine years:

> The differing restrictions placed on individuals and unincorporated associations on the one hand, and on unions and corporations, on the other, reflect a judgment by Congress that these entities have differing structures and purposes, and that they therefore may require different forms of regulations in order to protect the integrity of the electoral process.

*California Medical Ass'n v. Federal Election Comm'n,* 453 U.S. 182, 201, 101 S.Ct. 2712, 2724, 69 L.Ed.2d 567 (1981).

■ Further, this Court does not interpret subsection (A) of § 3599.03 as prohibiting internal communications through its own regularly published periodicals, and, thus, does not reach the issues raised relative to O.R.C. § 3599.03(F). That subsection expressly permits nonprofit corporations to use their money for internal communications to a limited number of named recipients; Plaintiffs interpret this as reflective of legislative intent to bar internal communications by unions with their members, pursuant to § 3599.03(A). Such interference with political speech within the confines of a labor organization's own membership, through its regularly published and circulated periodicals, would appear to be well protected by the First Amendment as interpreted by a long line of U.S. Supreme Court cases, beginning with *United States v. C.I.O.,* 335 U.S. 106, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948) and including the recent case of *McIntyre v. Ohio Elections Comm'n,* — U.S. ——, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). While *McIntyre* did not involve internal political statements, it demonstrates clearly the core pro-

tection afforded political speech by the First Amendment. While this Court agrees with Plaintiffs that any interpretation of subsection (A) that prohibits internal political communications by unions with their members through regularly published and circulated periodicals would be violative of their First Amendment rights, the Court cannot reach the conclusion that § 3599.03(A) is therefore facially unconstitutional.

This Court concludes that amendments to O.R.C. § 3599.03(A) and (B) as contained in S.B. 8, which place restrictions on direct political contributions by labor organizations, as well as corporations, do not violate Plaintiffs' rights to political free speech or to equal protection of the laws, as guaranteed by the First and Fourteenth Amendments, respectively, to the U.S. Constitution. Therefore, no preliminary injunctive relief will be granted with respect to such sections.

### B. O.R.C. § 3517.102(D)(1)

■ This subsection is "close" to a mirror image of the so-called "anti-proliferation rules" contained in the 2 U.S.C. § 441a(5). The Ohio statute as amended by S.B. 8 provides:

> (D)(1) FOR PURPOSES OF THE LIMITATIONS PRESCRIBED IN DIVISION (B)(2) OF THIS SECTION AND THE LIMITATIONS PRESCRIBED IN DIVISIONS (C)(1), (2), (3), (4), AND (5) OF THIS SECTION, WHICHEVER IS APPLICABLE, ALL CONTRIBUTIONS MADE BY AND ALL CONTRIBUTIONS ACCEPTED FROM POLITICAL ACTION COMMITTEES THAT ARE ESTABLISHED, FINANCED, MAINTAINED, OR CONTROLLED BY THE SAME CORPORATION, ORGANIZATION, LABOR ORGANIZATION, CONTINUING ASSOCIATION, OR OTHER PERSON, INCLUDING ANY PARENT, SUBSIDIARY, DIVISION, OR DEPARTMENT OF THAT CORPORATION, ORGANIZATION, LABOR ORGANIZATION, CONTINUING ASSOCIATION, OR OTHER PERSON, ARE CONSIDERED TO HAVE BEEN MADE BY OR ACCEPTED FROM A SINGLE POLITICAL ACTION COMMITTEE.

The provision of the FECA which the Ohio statute closely resembles provides, in relevant part, as follows:

> (5) For purposes of the limitations provided by paragraph (1) and paragraph (2), all contributions made by political committees established or financed or maintained or controlled by any corporation, labor organization, or any other person, including any parent, subsidiary, branch, division, department, or local unit of such corporation, labor organization, or any other person, or by any group of such persons shall be considered to have been made by a single political committee....

FECA § 441a(5).

The Ninth Circuit has held that the statutory language quoted above must be viewed against a substantive determination that the affected entities are, in fact, subsidiaries, branches, divisions, departments or local units of the alleged "parent" union, and that determination can "be made only by examining the organizational division of power between the union in question and the larger organization." *Federal Election Comm'n v. Sailors' Union*, 828 F.2d 502, 506 (9th Cir. 1987). The Court then proceeded to consider the organic structure of each entity to determine the appropriateness of aggregating for purposes of the contribution limits under the statute. This has become known as a "facts and circumstances" test.

The Michigan statute to which the Ohio section is analogous was analyzed by the Court in *Michigan State AFL–CIO v. Miller, supra*. However, that statute, MFCA § 5211(b) and (c), goes far beyond the comparable federal and Ohio statutes by creating in subsections (b) and (c) illustrations which demonstrate the absolute nature of the statute, permitting none of the investigation mandated by the Ninth Circuit in *Sailors' Union*. The relevant Michigan statute states:

> (11) For purposes of the limitations provided in subsections (1) and (3), all contributions made by political committees or independent committees established by any corporation, joint stock company, or labor organization, including any parent,

subsidiary, branch, division, department, or local unit thereof, shall be considered to have been made by a single independent committee. By way of illustration and not limitation, all of the following apply as a result of the application of this requirement:

\*     \*     \*     \*     \*     \*

(b) All of the political committees and independent committees established by a single national or international labor organization, by a labor organization of that national or international labor organization, by a local labor organization of that national or international labor organization, or by any other subordinate organization of that national or international labor organization, or by any combination thereof, are treated as a single independent committee.

(c) All of the political committees and independent committees established by an organization of national or international unions, by a state central body of that organization, by a local central body of that organization, or by any combination thereof, are treated as a single independent committee.

MFCA § 5211(b) and (c).

The illustrations demonstrate the broad intent of the legislature and negate the reality of legitimate independent political voices within a single union. As noted by Judge Borman, the statute "assumes that all affiliates of a union are in a monolithic organization." He held that because of the infirmities in the Michigan statute, those sections violated the right to free association and expression of members of separate labor units in contravention of the First Amendment.

In comparing the Ohio statute to the analogous federal and Michigan statutes, this Court concludes that the Ohio statute quoted above, O.R.C. § 3517.102(D)(1), is clearly distinguishable from its Michigan counterpart, and is more reflective of the federal statute, a part of the FECA. Thus, it is subject to the same tests, which become safeguards, as those applied by the Ninth Circuit in *Sailors' Union*. Strangely, the constitutional attack

urged by Plaintiffs here was absent in *Sailors Union*. Plaintiffs' brief speaks in terms of "if" the Ohio act is construed to require aggregation of otherwise separate unions and funds, and "might" be a sufficient predicate for imputing liability. That strained possibility is insufficient to declare the statute a significant impingement upon the First Amendment rights of speech and association of each labor organization and/or PAC. This Court holds that O.R.C. § 3517.102(D)(1) is not violative of the U.S. Constitution. However, it is strongly urged that the Secretary of State adopt appropriate regulations reflecting the *Sailors' Union* "facts and circumstances" test.

**C. O.R.C. § 3517.082(B)(3) and (D).**

█  S.B. 8 amends O.R.C. § 3517.082 by including in (B)(1) labor organizations, as well as profit and nonprofit corporations, and by adding a new section, (B)(3). The relevant sections read as follows:

(B)(1) A corporation and a nonprofit corporation may solicit contributions from its stockholders, officers, directors, trustees that are not corporations OR LABOR ORGANIZATIONS, and employees.

\*     \*     \*     \*     \*     \*

(3) A LABOR ORGANIZATION MAY SOLICIT CONTRIBUTIONS FROM ITS MEMBERS, OFFICERS, AND EMPLOYEES.

\*     \*     \*     \*     \*     \*

(D) Solicitations of contributions pursuant to division (B) of this section from employees OF A CORPORATION OR MEMBERS AND EMPLOYEES OF A LABOR ORGANIZATION other than executive and administrative employees OF A CORPORATION OR OFFICERS AND EXECUTIVE AND ADMINISTRATIVE EMPLOYEES OF A LABOR ORGANIZATION shall be in writing and shall not be made more than FOUR TIMES during each calendar year. Any person who solicits any employee of a corporation OR MEMBER OR EMPLOYEE OF A LABOR ORGANIZATION for a contribution to a political action committee established or administered by the corporation OR

564

LABOR ORGANIZATION under division (A)(1) of this section shall inform the employee OR MEMBER at the time of the solicitation that he may refuse to make a contribution without suffering any reprisal.

(Capitalized portions reflect new language pursuant to S.B. 8).

The above quoted sections restrict the pool of potential solicitees of corporations and labor organizations; as well, they restrict the manner of those solicitations. In contrasting subsection (3) to subsection (1) it is clear that the pool of potential solicitees for labor organizations is significantly restricted as compared with corporations. This is particularly evidenced with regard to central union organizations, such as Plaintiff Toledo Area AFL–CIO Council. Exacerbating the restriction is the fact that it applies to the PACs of such labor organizations (and corporations). Labor organizations cannot solicit each other nor other "natural" objects of solicitation for support of their PACs. Central bodies, with few employees and no members other than affiliated union organizations, have precious few solicitees left if the quoted provisions become viable, unless the definition of "members" as amplified and/or adopted by the Secretary of State in regulations promulgated pursuant to O.R.C. § 3517.15 is closely patterned after the federal rules as set forth in 11 C.F.R. 114.1(e)(4).[1]

By contrast, corporations may solicit contributions from their "stockholders, officers, directors, trustees that are not corporations or labor organizations, and employees." Obviously, the pool afforded corporations, for profit and nonprofit, is infinitely broader than that afforded labor organizations. The issue is whether such restrictions upon labor organizations violates either or both the First and Fourteenth Amendments. Plaintiffs assert that the sections do, in fact, violate their political free speech and equal protection rights while Defendants argue that such differences are amply justified.

Plaintiffs contend at page 27 of their brief that "Ohio's scheme as to central labor bodies is not the 'least restrictive means' available" to address the relevant issue. Ohio has no provision expanding the definition of "members" of a national or international union or federation such as the federal regulation set forth in footnote 1.

The comparison of permissible solicitees found on page 29 of Plaintiffs' brief is extremely graphic and telling. Unlike the federal statute and its regulations, Ohio corporations are permitted to solicit all of their employees, and nonprofit corporations are permitted, additionally, to solicit the employees of their members, be those members unincorporated or incorporated.

This same issue recently faced the Court in *Michigan AFL–CIO, et al. v. Miller, et al. supra.* That Court found the applicable Michigan statute violated the equal protection afforded the Plaintiff labor organizations "because it prevents central labor bodies from exercising their right to political speech by soliciting members of their affiliates, while the Chamber (Michigan Chamber of Commerce) is permitted to solicit stockholders of its 'members'."

This Court holds that the restrictions contained in subsection (B)(3) of O.R.C. § 3517.082, especially when viewed in light of subsection (1), violate the free speech and association, as well as the equal protection of the law guarantees afforded Plaintiffs under the First and Fourteenth Amendments, respectively. It is true that a broad definition of "members" could be adopted by Defendant Taft which would alleviate the problem; however, until that occurs the section is deemed facially unconstitutional. This Court, like its Michigan counterpart, must deal with the statute as drafted. For instance, subsection (F) of O.R.C. § 3599.031 patently states that each national, regional, state and local affiliate of a labor organization shall be considered a distinct entity for purposes of that section and another (requiring reporting); for what reason did the legislature omit the

---

**1.** § 114.1(e)(4) "Notwithstanding the requirements of paragraphs e(2)(i) through (iii) of this section, *members of a local union are considered to be members* of any national or international union of which the local union is a part *and of any federation with which the local, national, or a international union is affiliated."* 11 C.F.R. 114.1(e)(4) (Rev. 1/1/95) (emphasis added).

definition of, among other terms, "member" and other critical terms? Does the absence here (in § 3517.082) evidence an intent to follow the federal legislation or regulations, or the intent to do just the opposite? In the absence of certainty this Court feels compelled to hold such section facially unconstitutional under the First and Fourteenth Amendments.

Since § 3517.082(E) is objected to by Plaintiffs and involves impairment of contracts considerations, and since the holding of this Court will be preliminarily to enjoin effectiveness of the amendments to § 3517.082(B)(3), there is no need to discuss the impairment of contract issue here. *But see* subdivision (E) of this opinion.

■ Subsection (D) of O.R.C. § 3517.082 requires solicitations of political contributions from employees of corporations or employees or members of labor organizations to be in writing and not to be made more than four times in any calendar year. Further, the solicitor is required to "inform the employee or member at the time of the solicitation that he may refuse to make a contribution without suffering any reprisal." No similar restrictions are placed on the solicitors with respect to suppliers, customers, contractors or others similarly subject to coercion or reprisal. No similar restriction on the number of solicitations per year of an organization's own members is contained in the FECA.

Plaintiffs contend that these "additional burdens, unmatched in the federal law, are gratuitous and invalid, plainly not regulating solicitations in the least restrictive manner, as required under strict scrutiny analysis." (Plaintiffs' Brief, at 32). The Supreme Court has found that solicitation of funds, particularly when intertwined with the advocacy of causes or the communication of ideas, is speech protected by the First Amendment. While it did not involve political speech, the case of *Riley v. National Fed'n of the Blind, Inc.,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) is instructive on this point of paternalistic intrusion into otherwise protected speech. *Riley* involved North Carolina's definition of "reasonable fees" that a professional fundraiser may charge, and also required fundraisers to disclose to potential donors before solicitation the percentage of charitable contributions collected during the previous twelve months that were actually turned over to charity. The Court struck down both provisions as violative of the free speech protections afforded by the First Amendment. Speaking for the Court, Justice Brennan declared:

> The State's remaining justification—the paternalistic premise that charities' speech must be regulated for their own benefit—is equally unsound. The First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it. *See Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 224, 107 S.Ct. 544, 554, 93 L.Ed.2d 514 (1987) [(1986)] (criticizing State's asserted interest in protecting 'the Republican party from undertaking a course of conduct destructive of its own interests,' and reiterating that government 'may not interfere [with expressions of First Amendment Freedoms] on the ground that [it] view[s] a particular expression as unwise or irrational') (quoting *Democratic Party of United States v. Wisconsin ex rel. La Follette,* 450 U.S. 107, 124, 101 S.Ct. 1010, 1020, 67 L.Ed.2d 82 (1981)); cf. *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 791–792, and n. 31, 98 S.Ct. 1407, 1424, and n. 31, 55 L.Ed.2d 707 (1978) (criticizing State's paternalistic interest in protecting the political process by restricting speech by corporations); *Linmark Associates, Inc. v. Willingboro,* 431 U.S. 85, 97, 97 S.Ct. 1614, 1620, 52 L.Ed.2d 155 (1977) (criticizing, in the commercial speech context, the State's paternalistic interest in maintaining the quality of neighborhoods by restricting speech to residents). 'The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion.' *Thomas v. Collins,* 323 U.S. 516, 545, 65 S.Ct. 315, 329, 89 L.Ed. 430 (1945) (Jackson, J., concurring). *To this end, the government, even with the purest of motives, may not substitute its judgment as to how best to speak for that of speakers and listeners;*

*free and robust debate cannot thrive if directed by the government. We perceive no reason to engraft an exception to this settled rule for charities.*

*Id.* at 790–791, 108 S.Ct. at 2674–2675 (emphasis added).

It is clear that paternalism is not a substitute for constitutional regulation of solicitations. The intrusion of government into the area of political speech appears in this instance to be unwarranted by a desire to protect workers/employees from otherwise protected speech. The unnecessary negativism inherent in the subsection under question is an unwarranted intrusion into the free speech rights of the Plaintiffs. Prohibiting oral solicitations is totally unwarranted as well. The right of free speech includes "speech" of all kinds; the Court observes that *effective* solicitation of funds, charitable or political, is recognized at least as effective (if not more so) through oral speech. Especially in a "union hall" setting, oral requests to significant groups of members has been the traditional and effective method of fundraising and other communication. To deprive solicitors of such tools and restrict them to written solicitation is certainly not the "least restrictive" or "least intrusive" method to address the relevant issues sought to be remedied by the legislature.

While taken individually the restrictions *could* be viewed as reasonable intrusions on First Amendment rights of the Plaintiffs, the cumulative impact of subsection (D) creates a significant and unreasonable restriction on the political free speech and association rights of labor organizations as well as corporations. This Court additionally finds that O.R.C. § 3517.09(C),[2] which has the same import as O.R.C. § 3517.082(D), is subject to the same constitutional infirmity as outlined above. Both subsections fail the test of constitutionality due to unreasonable impinge-

ment on political free speech guaranteed by the First Amendment.

**D. O.R.C. § 3517.092(F)(1) and (2)**

▉ The following sections, together with those discussed in subdivision E hereof, address political activity of public employees and employers.

(F)(1) NO PUBLIC EMPLOYEE SHALL SOLICIT A CONTRIBUTION FROM ANY PERSON WHILE THE PUBLIC EMPLOYEE IS PERFORMING HIS OFFICIAL DUTIES OR IN THOSE AREAS OF A PUBLIC BUILDING WHERE OFFICIAL BUSINESS IS TRANSACTED OR CONDUCTED.

(2) NO PERSON SHALL SOLICIT A CONTRIBUTION FROM ANY PUBLIC EMPLOYEE WHILE THE PUBLIC EMPLOYEE IS PERFORMING HIS OFFICIAL DUTIES OR IS IN THOSE AREAS OF A PUBLIC BUILDING WHERE OFFICIAL BUSINESS IS TRANSACTED OR CONDUCTED.

(3) AS USED IN DIVISION (F) OF THIS SECTION, "PUBLIC EMPLOYEE" DOES NOT INCLUDE ANY PERSON HOLDING AN ELECTIVE OFFICE.

While not expressly stated, these sections are designed to separate public employers and employees, together with public buildings where official business is conducted from the spectrum of partisan politics. "Contribution" is defined in O.R.C. § 3517.092(A)(6) to include "a contribution to any political party, campaign committee, political action committee, or legislative campaign fund." The thrust of § 3517.092 is directed at partisan campaigns and not issues. However, the inclusion of SUBSECTION (F)(3) would seem to becloud the issues raised, for (3) eliminates elected office-

---

2. (C) AN EMPLOYER OR LABOR ORGANIZATION THAT, DIRECTLY OR THROUGH ANOTHER PERSON, SOLICITS AN EMPLOYEE OF THE EMPLOYER OR A MEMBER OF THE LABOR ORGANIZATION FOR A CONTRIBUTION TO A CANDIDATE, CAMPAIGN COMMITTEE, POLITICAL ACTION COMMITTEE, LEGISLATIVE CAMPAIGN FUND, OR POLITICAL PARTY SHALL INFORM THE EMPLOYEE OR MEMBER AT THE TIME OF THE SOLICITA-

TION THAT MAKING A CONTRIBUTION IS VOLUNTARY AND THAT A DECISION OF THE EMPLOYEE OR MEMBER TO MAKE A CONTRIBUTION OR NOT TO MAKE A CONTRIBUTION WILL NOT BENEFIT THE EMPLOYEE OR MEMBER OR PLACE THE EMPLOYEE OR MEMBER AT A DISADVANTAGE WITH RESPECT TO HIS EMPLOYMENT BY THE EMPLOYER OR HIS MEMBERSHIP IN THE LABOR ORGANIZATION.

holders from the proscriptions of (F)(1) and (2). There would appear no justification for subsection (3) *if* the justification for (1) and (2) is as stated.

In 1973 the Supreme Court considered two cases which impact significantly this Court's consideration of the matters at issue. *United States Civil Service Comm'n v. National Assoc. of Letter Carriers AFL–CIO, et al.*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) and *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

> *Broadrick* upheld the prohibition of solicitation for partisan political purposes as not overbroad, while *Letter Carriers* upheld a provision of the Hatch Act which prohibited federal employees from taking active roles in political campaigns. It suffices for purposes of this opinion to quote from pertinent passages of each case:

> It remains a 'matter of no little difficulty' to determine when a law may properly be held void on its face and when 'such summary action' is inappropriate. But the plain import of our cases is, at the very least, that facial overbreadth adjudication is an exception to our traditional rules of practice and that its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' toward conduct and that conduct—even if expressive—falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct. Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe. To put the matter another way, particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep. It is our view that § 818 is not substantially overbroad and that whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied.

*Broadrick*, at 615–616, 93 S.Ct. at 2917–2918 (citations omitted).

> We unhesitatingly reaffirm the *Mitchell* [*United Public Workers v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947) ] holding that Congress had, and has, the power to prevent Mr. Poole and others like him from holding a party office, working at the polls, and acting as party paymaster for other party workers. An Act of Congress going no farther would in our view unquestionably be valid. So would it be if, in plain and understandable language, the statute forbade activities such as organizing a political party or club; actively participating in fund-raising activities for a partisan candidate or political party; becoming a partisan candidate for, or campaigning for, an elective public office; actively managing the campaign of a partisan candidate for public office; initiating or circulating a partisan nominating petition or soliciting votes for a partisan candidate for public office; or serving as a delegate, alternate or proxy to a political party convention. Our judgment is that neither the First Amendment nor any other provision of the Constitution invalidates a law barring this kind of partisan political conduct by federal employees.

*Letter Carriers*, 413 U.S. at 557, 93 S.Ct. at 2886.

> But, as the Court held in *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968), the government has an interest in regulating the conduct and 'the speech of its employees that differ[s] significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees.' Al-

though Congress is free to strike a different balance than it has, if it so chooses, we think the balance is has so far struck is sustainable by the obviously important interests sought to be served by the limitations on partisan political activities now contained in the Hatch Act.

*Letter Carriers,* 413 U.S. at 564, 93 S.Ct. at 2890.

There is another consideration in this judgment: it is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent.

*Letter Carriers,* 413 U.S. at 565, 93 S.Ct. at 2890.

As previously stated herein, any impingement on political speech must be justified by an overriding governmental purpose, measured against a standard of strict construction. Subsections (F)(1) and (2) here at issue would appear to the Court as an attempt to eliminate from government the solicitation of funds by or from public employees, in public facilities, thus promoting bipartisan public support of government, "confidence in the system of representative government", and reducing partisan pressure on or by public employees. Such ends, in this Court's view, justify the means and clearly are justified by the reasoning reflected in both *Broadrick* and *Letter Carriers.* The apparent intent of the legislature is not necessarily paternalistic, as urged by Plaintiffs, but appears to be a legitimate public/legislative purpose, justifying a slight impact on political speech. This Court holds that subsections (F)(1) and (2) do not violate constitutional imperatives of the First Amendment.

**E. O.R.C. § 3599.031(H) and (I)**

■ Simply stated, subsection (H) prohibits public employers from administering voluntary political check-off; while Subsection (I) abrogates any conflicting provisions of contract between labor organizations and public employers, whether existing or in the future. Non-public employers are not similarly restricted.[3] Because this Court finds subsection (H) violative of both the First and Fourteenth Amendments, it is unnecessary to reach the issue of whether subsection (I) is an unconstitutional abrogation of contracts and violative of Article I, Section 10 of the United States Constitution.

As stated elsewhere in this opinion, it is well established that governmental intrusion into or limitations on political speech must be justified under the test of strict scrutiny. *Buckley v. Valeo, supra.* If the legislature's ban of voluntary political contribution check-off in public employment settings "is to survive constitutional challenge, it must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights." *Elrod v. Burns,* 427 U.S. 347, 363, 96 S.Ct. 2673, 2685, 49 L.Ed.2d 547 (1976). In *Elrod* the Court considered the practice of patronage dismissals, which it found clearly infringed First Amendment guarantees. However, Justice Brennan observed "our inquiry is not at an end, for the prohibition on encroachment of First Amendment protections is not an absolute." *Id.* at 360, 96 S.Ct. at 2683. The Court held that patronage dismissals cannot be justified; more fundamentally, that the severe encroachment patronage dismissals make on the protections guaranteed by the First Amendment outweighs any contribution they may make to the democratic process.

---

**3.** (H) NO PUBLIC EMPLOYER SHALL DEDUCT FROM THE WAGES AND SALARIES OF ITS EMPLOYEES ANY AMOUNTS FOR THE SUPPORT OF ANY CANDIDATE, SEPARATE SEGREGATED FUND, POLITICAL ACTION COMMITTEE, LEGISLATIVE CAMPAIGN FUND, POLITICAL PARTY, OR BALLOT ISSUE.

(I) IN ADDITION TO THE LAWS LISTED IN DIVISION (A) OF SECTION 4117.10 OF THE REVISED CODE THAT PREVAIL OVER CONFLICTING AGREEMENTS BETWEEN EMPLOYEE ORGANIZATIONS AND PUBLIC EMPLOYERS, THIS SECTION PREVAILS OVER ANY CONFLICTING PROVISIONS OF AGREEMENTS BETWEEN LABOR ORGANIZATIONS AND PUBLIC EMPLOYERS ENTERED INTO PURSUANT TO CHAPTER 4117. OF THE REVISED CODE.

That brings us to the consideration of the entire scheme created by O.R.C. § 3599.031. That statute permits voluntary check-off for contributions to, among others, a separate segregated fund, a PAC of an employer or the employers employees labor organization, or a ballot issue. It eliminates, however, by specific mandate of subsection (H) the right of public employees to voluntary check-off for political contributions by prohibiting public employers from deducting such amounts from wages and salaries of its employees. The crucial issue is whether such right to check-off is protected by the Constitution and if so, whether its deprivation meets a vital governmental end.

Plaintiffs cite the Sixth Circuit case of *Kentucky Educators Pub. Affairs Council (KEPAC) v. Kentucky Registry of Election Fin.*, 677 F.2d 1125 (6th Cir.1982), wherein the Court found no reason to disturb the District Court's injunction enjoining the Registry from interfering with the reverse check-off payroll deduction method for political contributions to the PAC of the state educators, KEPAC. However, in that case it·was clear that Kentucky state law permitted such check-off so long as not coercive, which the Court held it was not. The Court clearly stated that "KEPAC has no constitutional right to a check-off or payroll deduction system for political fund raising," citing *Charlotte v. Int'l Ass'n. of Firefighters*, 426 U.S. 283, 96 S.Ct. 2036, 48 L.Ed.2d 636 (1976). Kentucky law permitted employee organizations to participate in payroll deductions, and, since the evidence indicated the reverse check-off system was not coercive, the Kentucky Corrupt Practices Act was not deemed violated. The First and Fourteenth Amendment issues raised by Plaintiffs here were not clearly addressed by the Sixth Circuit.

The Defendants' brief compares the anti-solicitation/participation cases (*Broadrick* and *Letter Carriers*) with the termination of check-off for political contributions by public employees who belong to a labor organization. Such comparison between overt public acts and passive check-off do not appear justified. There appears to be no attempt by the Ohio legislature to prohibit political activity, but merely to eliminate check-off to as-

sist that activity. While, as Defendants assert, this would at first blush appear to dictate a finding of only slight intrusion into protected political speech, further inquiry is necessary.

Defendants assert that the elimination of check-off supports "the State's interest in avoiding the appearance of corruption in the electoral process, the State's interest in preventing government employers from incurring the administrative expenses involved in providing political check-off, the State's interest in preventing the entanglement of public employees in the political process and the State's prophylactic interest in protecting public employees from coercive political check-off requests", all of which justifies the distinction between permitting private employer check-off and prohibiting public employer check-off. (Defendants' Brief at p. 35). How the state legislature justified the elimination of withholding public employees' political contributions remains but a calculated assumption in the absence of legislative history. It is clear that the administrative expense is a nonissue in this day of computerization; but to permit only nonpartisan campaign contributions would indeed be an administrative nightmare. It is further clear that from the point of view of the impacted unions and employees this is no "modest" imposition; for a union which represents only public employees, it is a major restriction. And the check-off is not an overt act, such as soliciting contributions in public buildings during working hours, but a mere passive accommodation to the political fundraising efforts of the labor organization, which efforts are conducted outside of public buildings and on private employee time.

A significant issue remains for consideration: once having granted the right of check-off and continuing that right in the private sector, what reasons now justify its prohibition in the public sector? The Defendants rely heavily on this Circuit's pronouncement that there is no constitutional right to political check-off. *Kentucky Educators Pub. Affairs Council v. Kentucky Registry of Election Fin., supra.* However, the issue before that Court was not constitutionality of removal of the right to check-off; the

issue there was whether reverse check-off was "coercive" under Kentucky law and therefore illegal. The Sixth Circuit held it was not coercive and, therefore, was legal.

Defendants further rely on *Charlotte v. Int'l Ass'n of Firefighters,* 426 U.S. 283, 96 S.Ct. 2036, 48 L.Ed.2d 636 (1976). That case is clearly distinguishable from that at issue here. That case involved the City's refusal to withhold the union's *dues,* payable by firemen, from their paychecks. However, the union represented only 351 of the 543 uniformed members of the fire department. The City refused withholding unless it was for all department employees. Justice Marshall, speaking for a unanimous Court, held that the refusal need meet only a reasonableness standard and the standard was satisfied. The fact that the City's withholding practice excluded the union employees was held "insufficient to transform the city policy into a constitutional violation." *Charlotte,* at 289, 96 S.Ct. at 2040. Thus, the Equal Protection Clause was not violated by this "all or nothing" approach of the City.

Nothing has been submitted to this Court which addresses its inquiry to the experience in other states. State legislatures and their reaction to the needs of their citizens are fundamental demonstrations of the democratic process—needs perceived and laws enacted. While all parties acknowledge there is no fundamental constitutional right to check-off, its elimination for public employers impacts their union employees, when viewed against the backdrop of the entire restrictive provisions of S.B. 8, imposes a serious impairment of the right to effective political fundraising; and hence significantly impinges upon effective political voice/speech of the public employees and their unions. Further, when compared to the blessing given check-off for political contributions in the private sector, the impingement on the Equal Protection benefits of the Fourteenth Amendment is unreasonable and unjustified. The Defendants' arguments relative to insulation of the public sector from partisan politics, while effective with respect to overt acts of solicitation, fall short of justification for denial of check-off rights.

Therefore, § 3599.03(H) is held unconstitutional and a preliminary injunction will issue as prayed for.

■ While the declaration of unconstitutionality of subsection (H) would seem to negate the necessity to consider subsection (I), this Court views the two sections in *pari materia* and will briefly consider the latter subsection. It is clear that the justification for governmental abrogation of contract, as attempted by subsection (I), must be strictly measured against the constraints of Article I, Section 10 of the Constitution. Since this Court has determined at this juncture preliminarily to enjoin the effectiveness of subsection (H), we should review the interplay between subsection (I) and O.R.C. § 4117.10 to which it refers. While the latter section controls the general content and methodology of approval of labor contracts involving state agencies, it neither authorizes nor prohibits check-off, political or otherwise.

The constitutional prohibition against impairment of contracts is not absolute; finding impairment is but a preliminary step in resolving the more difficult issue of whether that impairment is permitted or prohibited by the Constitution. *United States Trust Co. v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). It has long been held that public employment contracts are within the gambit of this clause. *Ludwig v. Board of Educ.,* 72 Ohio App. 437, 27 O.O. 359, 52 N.E.2d 765 (1943); *Public Employees' Retirement Bd. v. Washoe County,* 96 Nev. 718, 615 P.2d 972 (1980); *Fazekas v. University of Houston,* 565 S.W.2d 299 (1978), appeal dismissed, 440 U.S. 952, 99 S.Ct. 1487, 59 L.Ed.2d 765 (1979).

O.R.C. § 4117.10 provides for agreements between a public employer and an exclusive representative governing the wages, hours, and terms and conditions of employment. That statute also addresses grievance procedures and legislative approval of agreements, and establishes an office of collective bargaining. Subsection (A) also provides that where certain provisions conflict with specific, enumerated laws, those laws prevail over any conflicting provision of such agreements. Nowhere is any mention made of check-off or any variation thereof. As noted above in the

discussion relative to subsection (H), there has been no showing of an overriding state interest which would also justify impairment of contracts that provide for voluntary public employee political check-off. The Court finds the cases cited by the Defendants to be clearly distinguishable from the case at issue here. In *Baltimore Teachers Union, Am. Fed'n of Teachers Local 340 v. Mayor of Baltimore*, 6 F.3d 1012 (4th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994), the Court was faced with a fact pattern quite different than in this case; there the City of Baltimore was faced with a budgetary shortfall, which the Court found justified salary reductions implemented to meet that crisis. While the Court found that such action was a substantial impairment of an existing contract, the vital needs of the city were being addressed by a narrowly drawn plan, reasonable under the circumstances. Among other things, the Court saw its task "to insure through the 'necessity and reasonableness' inquiry that states neither 'consider impairing the obligations of [their] own contracts on a par with other policy alternatives' or 'impose a drastic impairment when an evident and more moderate course would serve its purposes equally well,' *United States Trust*, 431 U.S. at 30–31, 97 S.Ct. at 1521–1522 * * *, nor act unreasonably 'in light of the surrounding circumstances,' *id.* at 31, 97 S.Ct. at 1522."

This Court finds that there is a significant impairment of contracts attempted by subsection (I); that no overriding state interest justifying such impairment has been demonstrated; that the elimination of such check-off rights is unreasonable in light of the attendant statutory scheme and surrounding circumstances; and that, therefore, such impairment violates the protection provided public contracts by Article I, Section 10 of the U.S. Constitution. This Court holds that O.R.C. § 3599.03(I) can have no efficacy with respect to public contracts, properly entered into and approved pursuant to O.R.C. § 4117.10 *prior* to the effective date of the statute, to-wit, August 23, 1995. Were subsection (H) valid, prospective impact on future public contracts addressed by subsection (I) would not be impacted by this holding.

### CONCLUSION

The amendments to the Ohio Campaign Finance Act adopted by S.B. 8 are to become effective August 23, 1995. The relatively short time span the parties have had to brief and argue the serious issues involved in this matter, and the few days between oral argument and written opinion both place some constraints on the depth and breadth of judicial opinion-writing which the gravity of First and Fourteenth Amendment issues generally justifiably require and deserve. As this Court indicated to the parties at hearing, the order resulting from this opinion is in response to a motion for *preliminary* injunction; one must be cognizant of the fact that this is but the first step in a long journey.

This Court concludes after due consideration of the issues, arguments of counsel at the preliminary injunction hearing, briefs of the parties, and the submissions of the parties accepted into evidence by the Court, that as to each of the provisions as to which the preliminary injunction order will issue:

(1) there is the likelihood of success on the merits;

(2) the Plaintiff will suffer significant deprivation of constitutional rights, in particular those guaranteed by the First and Fourteenth Amendments, if an injunction does not issue;

(3) there is a probability of substantial harm to Plaintiffs if said statutory provisions, the violation of which could result in criminal sanctions, are not enjoined; and

(4) the public's interest in free and open elections and an unimpeded political process is advanced by the issuance of the preliminary injunction.

The Court will issue a preliminary injunction to enjoin the enforcement of the amendments to the following sections of the Ohio Revised Code as reflected in S.B. 8:

(a) O.R.C. § 3517.082(B)(3)

(b) O.R.C. § 3517.082(D)

(c) O.R.C. § 3517.09(C)

(d) O.R.C. § 3599.03(H)

(e) O.R.C. § 3599.03(I), but only as it impacts existing contracts.

The Court denies Plaintiffs' motion for a preliminary injunction as to the following sections of the Ohio Revised Code amended by S.B. 8:

(1) O.R.C. § 3599.03(A) and (B)
(2) O.R.C. § 3517.102(D)(1)
(3) O.R.C. § 3517.092(F)(1) and (2).

IT IS SO ORDERED.