DECISION
{¶ 1} Plaintiff-appellant, J. Michael Branan, appeals from a judgment of the Franklin County Court of Common Pleas granting summary judgment for defendantsappellees Mac Tools and John Aden.
 {¶ 2} Appellant initiated this action with a complaint against his former employer, Mac Tools, and its president, John Aden. The complaint asserted claims for wrongful discharge in violation of Ohio public policy, intentional infliction of emotional distress, false imprisonment, and violation of right of privacy.
 {¶ 3} The trial court granted summary judgment for appellees on all claims, finding that there remained no genuine issue of material fact and that appellees were entitled to judgment as a matter of law. Appellant has timely appealed and brings the following assignments of error:
1. The trial court erred in granting the appellees' motion for summary judgment regarding the appellant's intentional infliction of emotional upset claim when there existed reasonable dispute of fact whether appellees' outrageous actions in falsely accusing the appellant of corporate espionage, subjecting appellant to a cruel and debasing interrogation, and to dispatch covert operatives to invade the appellant's privacy at home and to threaten harm to appellant and his family and friends caused appellant emotional distress.
2. The trial court erred in granting the appellees' motion for summary judgment regarding the appellant's false imprisonment claim when there existed a legitimate dispute of fact regarding whether the appellant was restrained against his will and consent, and appellees had no lawful justification for their actions in falsely imprisoning appellant.
3. The trial court erred in granting the appellees' motion for summary judgment regarding the appellant's public policy claim based on ohio revised section 2905.03 and the common law of false imprisonment when there existed a legitimate dispute of fact showing that appellant was terminated for complaining about and attempting to prevent similar wrongful treatment to a co-worker.
4. The trial court erred in granting the appellees' motion for summary judgment regarding the appellant's invasion of privacy claim when there existed no dispute of fact that the appellees wrongfully invaded appellant's privacy by opening and searching his personal briefcase without his consent and driving to appellant's residence to take photographs of him inside and outside his home.
 {¶ 4} The present matter was decided on summary judgment. Civ.R. 56(C) states that summary judgment shall be granted if:
* * * [T]he pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.
 {¶ 5} Accordingly, summary judgment is appropriate only where: (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. Tokles Son, Inc. v. Midwestern Indemn. Co. (1992),65 Ohio St.3d 621, 629, citing Harless v. Willis Day WarehousingCo. (1978), 54 Ohio St.2d 64. "The moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." Dresher v.Burt (1996), 75 Ohio St.3d 280, 293. Once the moving party meets its initial burden, the nonmovant must then produce competent evidence showing that there is a genuine issue for trial.
 {¶ 6} Appellate review of summary judgments is de novo. Koosv. Cent. Ohio Cellular, Inc. (1994), 94 Ohio App.3d 579, 588;Midwest Specialties, Inc. v. Firestone Tire Rubber Co.
(1988), 42 Ohio App.3d 6. We stand in the shoes of the trial court and conduct an independent review of the record. As such, we must affirm the trial court's judgment if any of the grounds raised by the movant at the trial court are found to support it, even if the trial court failed to consider those grounds.Dresher, supra; Coventry Twp. v. Ecker (1995),101 Ohio App.3d 38.
 {¶ 7} While much of the evidence presented in support of and in opposition to summary judgment in this case is contradictory, certain facts are not in controversy and form the general factual background of the case. Appellee, Mac Tools, formerly an independent company since 1980 has been owned by The Stanley Works ("Stanley"), a manufacturer and marketer of hand and power tools. Mac Tools is a retail distributor that operates on a mobile retail sales system under which Mac Tools distributors travel to mechanics' shops and workplaces to sell tools on site, either directly from stock on the tool van or for later delivery of special orders. The distributors traditionally have been independent contractors, but, during the period in question, Mac Tools also had company employees as distributors.
 {¶ 8} This retail model for high-end tool sales is intensely competitive. The industry leader is Snap-On Tools, and Mac Tools' competitors also include Matco Tools ("Matco") and Cornwell Tools. Matco and Mac Tools were, for part of their history, under common ownership, and for this and other reasons there is a substantial history of movement of employees from one company to another, as there is to a lesser degree between all four of the principal competitors in this industry. Success often hinges less on the particular virtues of the product line or company services than on the personality and skills of the distributor, and distributors may defect from one company to another while retaining their customer base. For this reason, both customer lists and distributor contract terms, while regarded as highly confidential at the upper levels of management, often may in fact be open secrets due to fraternization at the lower echelons as distributors and middle managers explore career opportunities with competitors.
 {¶ 9} After its acquisition by Stanley, Mac Tools struggled financially, in part because a transition from independent contractor distributors to employee-distributors had not met expectations. Appellee, John Aden, was recruited to fill the empty post of president of Mac Tools in 2000. His arrival coincided with a restructuring of Stanley that afforded Mac Tools somewhat more autonomy within the corporate group. Shortly after assuming the presidency of Mac Tools, Aden created and staffed a new department known as the Asset Protection Team. This department was created because inventory shrinkage and other theft losses were at an unacceptably high level, but it eventually began to address concerns about loss of confidential information to competitors.
 {¶ 10} Appellant came to Mac Tools in 1995 as a district business manager working in Baton Rouge, Louisiana; he was hired away from Matco where he had been a retail distributor and district sales manager. Appellant was transferred to Mac Tools headquarters in Columbus as part of the training division, and subsequently was promoted by Aden in May 2001 to one of the two National Accounts Manager positions in the company.
 {¶ 11} Toward the end of 2001 or the beginning of 2002, appellant, despite his recent promotion, fell from favor with Aden. This coincided with a period of renewed concern about loss of confidential information from Mac Tools to competitors, and the search for possible sources of such leaks. After an internal investigation initiated by Aden and conducted by the Asset Protection Team, Aden ordered appellant's termination from employment on February 6, 2002. Several other employees in addition to appellant were terminated or resigned as a result of the investigation including appellant's direct supervisor, Jim Organ.
 {¶ 12} Many of the details regarding appellant's firing and the departure of other employees during the same period are subject to vigorous dispute in the evidence presented by the parties in the present case. For purposes of summary judgment, however, we will examine the evidence presented by appellant, consisting principally of deposition testimony and affidavits, without assessing credibility, to determine whether appellant has presented sufficient evidence on each of the elements of the various claims set forth in his complaint to preserve a genuine issue of material fact to be resolved at trial.
 {¶ 13} Appellant testified in his deposition that when he accepted a position with Mac Tools, all parties were aware that he had previously worked for Matco and that his father-in-law still worked for that company in the Orlando, Florida area. During the early years of his employment with Mac Tools, the former president of the company, Linda Jacober, actually inquired of appellant if he would furnish inside information about Matco obtained from his relatives, but appellant refused the request.
 {¶ 14} Shortly after Aden took over the position of president of Mac Tools in 2000, appellant became aware that Aden appeared overly preoccupied with corporate espionage and information leaks to competitors, especially Matco. When appellant was offered a promotion in May 2001, Aden expressed similar suspicions about appellant in the promotion meeting, stating that he had once believed that appellant was a spy, but now considered appellant trustworthy. Aden informed appellant that there were electronic listening devices in the headquarters building that allowed Aden to keep an eye on everyone.
 {¶ 15} On February 5, 2002, appellant was "interrogated" by two members of the Asset Protection Team, Mike Frownfelter and Tim Hill, during an investigation into unauthorized access of Aden's computer and e-mail program by other Mac Tools managers. During this interrogation, appellant informed Hill and Frownfelter that he had not accessed Aden's computer. Appellant also denied that he had transmitted any confidential information about Mac Tools to anyone outside the company. Despite his denials, Hill and Frownfelter, in appellant's perception, refused to allow appellant to leave the room, shouted at him, and assumed physically threatening postures when appellant attempted to leave. During the interview, appellant suffered chest pains and specifically asked to leave twice and was refused. Appellant testified that at the time he firmly believed that, if he had attempted to leave the room, he would have been physically prevented from doing so by Hill or Frownfelter.
 {¶ 16} After appellant was released from his "interrogation," Aden went to appellant's office and again told appellant that Mac Tools had electronic listening devices with which it would conduct surveillance on employees, and intended to stalk corporate spies "to the end of the earth." (Branan Depo., at 151-153.) When appellant informed Aden that appellant had recently been offered a position with Cornwell Tools, Aden then accused appellant of being a spy and stated that he would make sure that appellant would never get another job, that appellant's newborn child would not have food or clothes, and that Aden would personally call the owner of Cornwell Tools to ensure that appellant was not hired.
 {¶ 17} Although appellant knew that he probably would be fired based on the day's events, he left the office on the evening of February 5 leaving his personal possessions, including his closed briefcase and cell phone, in his office because he trusted Mac Tools management to do the right thing with these items and return them if he was terminated. When appellant arrived home, he called fellow Mac Tools employee, Rick Smith, the other National Accounts Manager, who was based in California. Smith informed appellant that he was on a flight to Columbus at that moment and that he was summoned there because Asset Protection Team wished to question him. Appellant then complained to Smith about the treatment that he had received from the Asset Protection Team that day and warned Smith what to expect. On the following day, February 6, 2002, appellant called in sick and went to see his doctor because of his persistent chest pains. On the advice of his physician, appellant took the next two days off work. On the following day, February 7, 2002, appellant, in the company of a friend, Mike Boyhan, was performing yard work at his home when he observed a Ford Explorer drive by his house several times and park behind Boyhan's truck. Appellant concluded that the Asset Protection Team was photographing his home and writing down the license plates of cars parked in front of his home. Appellant, who would not receive his termination letter until later that day, assumed that this was because of continued suspicion on the part of Mac Tools management that he was a "corporate spy." Appellant pointed out the purported surveillance vehicle to Boyhan, who attempted to confront its occupants but was struck by a glancing blow by the vehicle as it sped away.
 {¶ 18} Appellant later received a cardboard box containing most but not all of his personal items from the office. The most significant omission was a CD containing his personal financial information, which he habitually kept in his briefcase. The briefcase was completely empty when it was returned to him. He considered the briefcase to be his private and personal property.
 {¶ 19} With respect to the incident involving the alleged surveillance of appellant's home, Mike Boyhan gave deposition testimony essentially confirming that of appellant. Boyhan added that, when he was struck by the Asset Protection Team's surveillance vehicle, he later filed a criminal complaint and witness statement with the Franklin County Sheriff's office regarding the incident.
 {¶ 20} The record also contains the deposition testimony of Jim Organ, who is the former National Sales Development Manager for Mac Tools and was appellant's direct supervisor. He reported directly to the company president, Aden. His two immediate subordinates were appellant and Smith. He considered appellant to be a "high-level performer," and recommended appellant for a promotion. (Organ Depo., at 43.) In approximately January 2002, Organ noted that Aden had developed a serious concern about information alleged being disseminated to Matco Tools, which was expressed during meetings at the company tool fair in January 2002. At this time, Aden made comments about appellant reflecting concerns that appellant was the source of the leaks. Aden advised Organ that this perceived problem with appellant could jeopardize Organ's position with the company. There were also concerns about whether Smith was the origin of the leaks. Despite Aden's comments, at no time during this period did Organ have any personal concerns about appellant's loyalty to Mac Tools, and at all times he evaluated appellant very highly in performance reviews.
 {¶ 21} Organ was subsequently informed by one of the regional managers that appellant had made certain comments indicating that big changes, in a negative sense, were in store for Mac Tools. This regional manager, Organ believed, was expressing concerns that these statements indicated appellant might be the source of the leaks of information to Matco Tools. This regional manager believed that appellant should be terminated based on this information. Based on this, Organ spoke with appellant and was reassured that appellant remained completely loyal to Mac Tools. Based on the regional manager's accusations, Organ met with Aden to discuss appellant's situation. Aden, at that time, indicated that if Organ did not act to eliminate the problem with appellant, which Organ interpreted as essentially a mandate to fire appellant, Organ's own future with Mac Tools would be jeopardized. Organ indicated that he was not willing to fire appellant based solely on second-hand information and innuendo.
 {¶ 22} Approximately one week later, Organ was escorted from his office by two members of the Asset Protection Team, Hill and Frownfelter, and taken to their office for an interview. He was asked about his use of computers and specifically whether he had accessed Aden's e-mail program. Organ indicated that he frequently accessed Aden's calendar to determine Aden's availability and schedule meetings. Organ had never been told that he should not access Aden's calendar and felt there was no sensitive information on the calendar that would cause any concern. Organ, although he occasionally would be shunted through the inbox for e-mail when accessing the calendar, never looked at anything in the e-mail inbox because he knew that nothing in Aden's e-mail would be of his concern.
 {¶ 23} At the conclusion of his interview with the Asset Protection Team, Organ produced a written statement in which he admitted accessing the calendar and, on one or two occasions, inadvertently viewing Aden's e-mail inbox. Organ was fired on the spot. He testified that he believes that he was fired because he refused to fire appellant for leaking confidential information to Matco Tools, even though Organ had no personal knowledge or even suspicion that appellant had done so.
 {¶ 24} Scott Wayland, former human resources manager for Mac Tools, also presented deposition testimony. He began work with Stanley in November 1999 in the human resources department and assisted in the recruitment of Aden as president of Mac Tools. When Mac Tools was given more autonomy within the Stanley organization, Wayland became human resources manager for Mac Tools, reporting to Aden. Because of his position of director of human resources for Mac Tools, Wayland eventually became involved in Aden's investigation into potential leaks of information to Matco Tools. Wayland produced at Aden's request a spreadsheet of personnel moves between the companies and delineating who within Mac Tools had information about Matco's obtention of classified information and what information had been leaked. Wayland's personal opinion was that Aden was excessively preoccupied with this leak of information, and that the concerns in this regard distracted Wayland from more productive matters. After the January 2002 company tool fair, a distributor motivational event, Aden became increasingly suspicious of appellant based on opinions by regional managers that appellant was the source of leaks of information to Matco Tools. These concerns escalated into the events that led to appellant's firing. Wayland was subsequently told that appellant had been investigated by the Asset Protection Team, primarily with respect to unauthorized use of Aden's e-mail, and that Wayland was to terminate appellant. Wayland believed that the specific reason for appellant's termination was that he had been instructed not to discuss his interrogation with anyone, but had done so nonetheless by calling Mike Smith.
 {¶ 25} Shortly thereafter, at the beginning of March 2002, Aden and Wayland spoke and Wayland was told that he would be leaving the company. Part of the reason given was the concern Wayland had expressed regarding the methods employed by the Asset Protection Team. Wayland believed their approach to be heavy-handed, including public interrogations, involvement of spouses in employee terminations, and threats to arrest spouses and put them in jail. Other tactics included having terminated employees pose for pictures holding written statements produced in connection with their terminations, and other humiliating tactics. As the director of human resources for the company, Wayland felt that the Asset Protection Team was significantly impacting personnel issues while remaining entirely outside of Wayland's control. These concerns were not well received by Aden.
 {¶ 26} Timothy Hill, a member of Mac Tools Asset Protection Team, gave deposition testimony in which he specifically denied asking for permission to look in appellant's briefcase or that he had actually searched the briefcase. Hill believed that Mac Tools' human resources department had taken custody of the briefcase and returned it to appellant.
 {¶ 27} Michael Frownfelter, another member of Mac Tools Asset Protection Team, also furnished deposition testimony in the case. Frownfelter testified that he was unaware that appellant had left his briefcase in the office, had never asked Wayland for permission to open the briefcase, and that no member of the Asset Protection Team had possession of the briefcase at any time. Frownfelter assumed that the briefcase had been collected with the other items from appellant's office and had been returned to appellant.
 {¶ 28} Felicia Branan gave deposition testimony describing the distress her husband experienced due to the circumstances of his firing and the events leading thereto. She felt that appellant had been highly stressed by the chain of events and was still affected emotionally and professionally.
 {¶ 29} Based upon the above evidence, appellant's first assignment of error asserts that the trial court erred in granting appellees' motion for summary judgment on appellant's intentional infliction of emotional distress claim. The tort of intentional infliction of emotional distress in Ohio consists of (1) conduct by a defendant that is so outrageous in character as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community; and (2) serious emotional distress resulting therefrom. Yeager v.Local Union 20 (1983), 6 Ohio St.3d 369. "It has not been enough that the defendant has acted with an intent which is tortuous or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by `malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. at 374-375.
 {¶ 30} We agree with the trial court that, even aggregating appellees' behavior and viewing the evidence of it in the light most favorable to appellant, we cannot characterize it as going beyond all possible bounds of decency. Appellant has presented evidence that he was interrogated for several hours, that his requests to leave were twice refused, that the Asset Protection Team members exhibited some degree of physical intimidation, and repeatedly called him a liar and a corporate spy. Immediately afterwards, appellee Aden threatened appellant by telling him that he would never get another job in the industry and would be unable to feed his child. Thereafter, Aden or the Asset Protection Team went through appellant's personal belongings in his office and briefcase, and observed appellant's home and took pictures of the home and vehicles parked in front of the home.
 {¶ 31} Without characterizing these actions with respect to the other torts that they may constitute, while they are perhaps reprehensible if believed, they are not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency" and be regarded as "atrocious" or "utterly intolerable in a civilized community." Yeager, at 375. A lawfully conducted investigation where wrongdoing is suspected, even if vigorously or oppressively undertaken, will not be characterized as extreme or outrageous. Motley v. Dilliard'sDept. Store (July 27, 1994), Summit App. No. CA16489. Justifiably or not, appellees vigorously pursued an investigation into leaks of proprietary information to competitors, including pursuing appellant as the source of a leak. Ultimately, this process led to appellant's termination. The attempt to restrain or confine appellant, if proven, might constitute the tort of wrongful imprisonment, but the circumstances under which that tort took place, we conclude, do not rise to the level of intentional infliction of emotional distress. Likewise, Aden's threats regarding appellant's future employment in the industry and ability to feed his family, while needlessly aggressive and insulting, are not extraordinary in the context of an emotionally charged employment termination where the mutuality of bad feelings appeared to run high. We accordingly find that the trial court did not err in granting summary judgment on appellant's intentional infliction of emotional distress claim and appellant's first assignment of error is overruled.
 {¶ 32} Appellant's second assignment of error asserts that the trial court erred in granting appellees' motion for summary judgment on appellant's false imprisonment claim. The tort of false imprisonment in Ohio occurs when a person confines another "intentionally without lawful privilege and against his consent within a limited area for any appreciable time, however short."Feliciano v. Kreiger (1977), 50 Ohio St.2d 69, 71, quoting 1 Harper and James, The Law of Torts (1956) 226, Section 3.7. However, the victim's "submission to the mere verbal direction of another, unaccompanied by force or threats of any character, cannot constitute false imprisonment, and there is no false imprisonment where an employer interviewing an employee declines to terminate the interview if no force or threat of force is used, and false imprisonment may not be predicated on a person's unfounded belief that he was restrained." Kinney v. Ohio Dept.of Admin. Serv. (Aug. 30, 1988), Franklin App. No. 88AP-27.
 {¶ 33} The trial court relied upon this language in Kinney
to conclude that there was no evidence that appellant had been restrained against his will. We conclude otherwise. Appellant presented his own testimony that he was confined to a limited area for an appreciable time, and that there was some measure of physical intimidation conveyed by the posture, behavior, and actions of the Asset Protection Team. Appellant's description of his feelings at the time of the interview or "interrogation" was that he believed that he would have been physically restrained or harmed had he attempted to overcome the refusal by Hill to allow him to leave the room. Appellant was not required, if he in fact subjectively held this belief, to provoke a physical altercation with two company representatives by attempting to leave against their wishes in order to test his belief. Whether or not appellant's belief that he was restrained was "unfounded" underKinney remains a material issue of fact in the present case and summary judgment on that basis was inappropriate.
 {¶ 34} The evidence is equally ambivalent on the question of whether the detention of appellant by the Asset Protection Team was "lawful." Certainly, some degree of questioning as a result of an internal investigation into wrongdoing is permissible.Christy v. Mr. Wiggs Dept. Store, Inc. (Mar. 13, 1980), Miami App. No. 79-CA-12; Kinney, supra. Nonetheless, Christy in particular, is distinguishable because in that case the employer's agent exercised far less drastic forms of verbal restraint in maintaining the employee under interrogation in a confined space. Likewise, the case of Monrean v. Higbee Dept.Stores, Inc. (Dec. 29, 2000), Trumbull App. No. 99-T-0099, is distinguishable because the investigation and interrogation in that case, while taking place on the employer's premises, was conducted in part by local police authorities. In the present case, confinement of appellant was motivated by nothing more than a desire to obtain information, which may be taken as a less justifiable motive than an immediate investigation into ongoing loss or theft where some form of detention and questioning might promote immediate recovery. On the present facts, as set forth by appellant's evidence, there remains a material issue of fact whether the detention of appellant for the period undertaken by appellees, and the degree of restraint exhibited therein, was "lawful."
 {¶ 35} We accordingly find that there remains a genuine issue of material fact for trial both on the question of whether appellant was confined against his consent and whether this confinement was lawful, and the trial court erred in granting summary judgment on appellant's claim for wrongful imprisonment. Appellant's second assignment of error is, accordingly, sustained.
 {¶ 36} Appellant's third assignment of error asserts that the trial court erred in granting summary judgment for appellees on appellant's claim for wrongful discharge in violation of public policy.
 {¶ 37} Generally, Ohio retains, with some exceptions, the common law doctrine of employment at will, absent an explicit agreement to the contrary between the employer and the employee. Under the doctrine of employment at will, a general or indefinite hiring is terminable at the will of either the employee or employer, and a discharge without cause will not give rise to an action for damages. Collins v. Rizkana (1995),73 Ohio St.3d 65, 67.
 {¶ 38} Ohio does recognize, however, among its exceptions to the employmentat-will doctrine, a public policy exception created to protect individuals from being discharged or disciplined for a reason prohibited by law. Greeley v. Miami Valley MaintenanceContractors, Inc. (1990), 49 Ohio St.3d 228. The exception is not limited to statutorily prohibited reasons for discharge, but extends to law derived from other sources, such as the Ohio and United States Constitutions, administrative rules and regulations, and the common law. Painter v. Graley (1994),70 Ohio St.3d 377, paragraph three of the syllabus. The elements of a claim for wrongful discharge in violation of public policy were reaffirmed by the Ohio Supreme Court in Kulch v. StructuralFibers, Inc. (1997), 78 Ohio St.3d 134, 151:
1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law[.] * * *
2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy[.] * * *
3. The plaintiff's dismissal was motivated by conduct related to the public policy[.] * * *
4. The employer lacked overriding legitimate business justification for the dismissal[.] * * *
Quoting Painter, and H. Perritt, The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie? (1989), 58 U.Cin.L.Rev. 397, 398-399.
 {¶ 39} Ohio courts have found claims to arise under circumstances where an employee was discharged because of a complaint to a regulatory agency or other administrative body reporting a violation by the employer. Greeley; Kulch, supra. Appellant's wrongful discharge claim asserts public policy in the present case based upon R.C. 4113.52(A)(1)(a), Ohio's "whistle-blower" statute, which explicitly prohibits retaliation by an employer against an employee who has reported violations of law committed by the employer to a direct supervisor or public authorities. The wrongful conduct claimed by appellant on the part of appellees in this case is the alleged false imprisonment of appellant; the "reporting" of this wrongful conduct took place in appellant's subsequent conversation with his co-worker Smith.
 {¶ 40} As the trial court noted, appellant arguably had the right to report the incident to administrative or law enforcement authorities. Appellant's testimony in this case, however, makes clear that he did not do so; appellant principally attempted to contact his co-worker and hierarchal equal, Smith, to warn Smith that he could expect an uncomfortable and vigorous interrogation upon arriving in Ohio. Appellant further requested Smith not to tell anyone about the telephone conversation. Appellant at best described the misconduct to a co-worker who was on the verge of suffering the same treatment, and who had no authority to investigate or correct the alleged misconduct, and who was expressly requested by appellant not to divulge that the conversation had taken place. Under these circumstances, the facts do not demonstrate that appellant suffered any disciplinary or retaliatory action for making a "report" of illegal conduct as defined under R.C. 4113.52(B), even if a finder of fact were subsequently to conclude in appellant's favor upon the independent question of whether unlawful conduct in the form of false imprisonment had taken place. Appellant, accordingly, cannot show that there remains a material issue of fact regarding his claim for wrongful discharge in violation of public policy, and the trial court did not err in granting summary judgment for appellees on this claim. Accordingly, appellant's third assignment of error is overruled.
 {¶ 41} We finally turn to appellant's fourth assignment of error, which asserts that the trial court erred in granting appellees' motion for summary judgment on appellant's invasion of privacy claim. This claim is based on two aspects of appellees' conduct: first, that appellant's personal briefcase was opened when he left it at Mac Tools' office after being interrogated by the Asset Protection Team; and second, that the asset protection team was dispatched to his home to take photographs.
 {¶ 42} In order to establish a claim for the tort for the wrongful invasion of privacy, a plaintiff must show a "wrongful intrusion into [his] private activities in a manner that outrages or causes mental suffering, shame, or humiliation to a person of ordinary sensibilities." Peitsmeyer v. Jackson Twp. Bd. ofTrustees, Franklin App. No. 02AP-1174, 2003-Ohio-4302, at ¶ 26. Such an intrusion must be "highly offensive" to a reasonable person. Browning v. Ohio State Highway Patrol,151 Ohio App.3d 798, 2003-Ohio-1108, at ¶ 85.
 {¶ 43} Assuming that in fact the asset protection team was dispatched to take photographs of appellant's house, we note that courts have generally held that the invasion complained of must involve the "viewing of affairs that are private and not in public view." York v. G.E. Co. (2001), 144 Ohio App.3d 191,194. Photographing of appellant's house or vehicles parked in front of the house would not constitute an invasion of privacy under these conditions. Since appellant has not alleged any photography of the interior of his house, these actions alone would not sustain the tort of wrongful invasion of privacy.
 {¶ 44} With respect to the alleged search of appellant's briefcase, the question is whether appellant had a reasonable expectation of privacy in the briefcase after he abandoned it at the office and left the premises on the day of his interview with the Asset Protection Team. Appellees rely on Peitsmeyer, supra, in which this court affirmed a summary judgment in favor of defendants where the alleged invasion of privacy consisted of the employer entering the employee's locked office, unlocking desk drawers, and searching a storage locker and discarding some personal belongings, including personal and sensitive items related to the plaintiff's son's legal troubles. We concluded that the plaintiff had no reasonable expectation of privacy with respect to his office furniture because he knew that the employer had master keys to the office and the plaintiff himself often left his office door unlocked.
 {¶ 45} We find, however, that a clear distinction must be drawn between the contents of a personal briefcase and personal items kept in a suite of office furniture belonging to the employer and located on the premises of the employer. Although appellees argue that, because appellant left the unlocked briefcase in his office upon leaving the premises, it must be concluded that he had abandoned all expectation of privacy, the question of whether the item is actually locked is not of itself conclusive of whether an expectation of privacy is retained. Moreover, in the present case, there is no evidence that employees other than appellant had the key to his briefcase, or routinely had access to it, so that the implied right of access found in Peitsmeyer because of the employer's possession of master keys has no parallel here. Likewise, while it can be argued that appellants might also have a diminished expectation of privacy because he was aware that his e-mail and cell phone records were being examined by his employer, he had heard and believed rumors that the employer was employing listening and monitoring devices in order to catch corporate spies, and that Aden had announced that he would go to great lengths to suppress such loss of proprietary information, none of these intrusive possibilities would necessarily compel appellant to abandon his reasonable belief that the privacy of his personal items in his personal briefcase would be invaded. Appellant's testimony was that he considered his briefcase his personal property, that he had no intention of abandoning his right to privacy therein, and that he considered it secure from intrusion or search without his permission.
 {¶ 46} Viewed as a whole, the evidence is sufficient to create a genuine issue of material fact as to whether appellant retained a reasonable expectation of privacy in his briefcase, and whether that expectation was violated by the alleged search of the briefcase by appellees. We accordingly find that the trial court erred in granting summary judgment for appellees on appellant's wrongful invasion of privacy claim with respect to the alleged search of appellant's briefcase, but not with respect to the alleged surveillance of his house. Appellant's fourth assignment of error is accordingly sustained to this extent and otherwise overruled.
 {¶ 47} In summary, appellant's first and third assignments of error are overruled, appellant's second assignment of error is sustained, and appellant's fourth assignment of error is sustained in part and overruled in part. The judgment of the Franklin County Court of Common Pleas granting summary judgment for appellees is affirmed in part and reversed in part, and the matter is remanded to the trial court for further proceedings in accordance with law and this decision.
Judgment affirmed in part and reversed in part; caseremanded.
Petree and Brown, JJ., concur.