OPINION
{¶ 1} Plaintiff-appellant, Peggy Ripley, appeals from the judgment of the Franklin County Court of Common Pleas granting summary judgment in favor of defendants-appellees, Robert G. Montgomery, Brad Hennebert, Marvin Farley, and Franklin County, on her claims for false imprisonment and wrongful discharge in violation of public policy. For the following reasons, we affirm.
 {¶ 2} On June 21, 2004, appellant filed suit against appellees asserting claims for wrongful discharge in violation of public policy and false imprisonment. These claims stemmed from the termination of appellant's employment with the Franklin County *Page 2 
Recorder's Office and the specific actions of Hennebert and Farley at the meeting in which Hennebert informed appellant of her termination.
 {¶ 3} Appellant began her employment with the Franklin County Recorder's Office on June 24, 2002. Appellant was hired as an administrative assistant to Recorder Montgomery and his Chief of Staff, Hennebert. Her duties included answering the phone, typing correspondence, and sitting at her desk outside the recorder's office to screen and greet visitors.
 {¶ 4} According to appellant, her employment relationship with appellees began to deteriorate in early 2004. Appellant alleged that Recorder Montgomery told her that he expected her to work on his re-election campaign and to attend and assist at various political functions. Appellant also contended that appellees told her that they expected her to accumulate compensatory time by working in excess of 40 hours per week so that she could be paid for time spent performing political activities, even if those political activities took place after normal working hours. Appellant alleged that appellees were dissatisfied with her willingness and/or ability to accumulate compensatory time and to engage in political activities on Recorder Montgomery's behalf. According to appellant, this dissatisfaction ultimately caused appellees to terminate her employment on May 18, 2004.
 {¶ 5} The events immediately preceding the termination of appellant's employment are as follows. On May 12, 2004, Recorder Montgomery held a fundraiser for his re-election campaign. According to appellant, Hennebert told her to leave work early to set up for the fundraiser. Appellant alleged that she left work early as instructed and sent an e-mail to the payroll officer requesting that her time records show her working *Page 3 
a full day. Appellant alleged that this was how she had previously been instructed to report her time when she worked on a fundraiser during regular work hours.
 {¶ 6} On May 18, 2004, appellant alleged she reported to work and found her computer unplugged and her desk in disarray. Hennebert approached appellant and stated, "we need to have a meeting." Hennebert led appellant to a conference room where another supervisor, Farley, was waiting.
 {¶ 7} According to appellant, she sat at the head of the table with Hennebert sitting around the table to her right and Farley sitting around the table to her left. There were two doors to the conference rooms: one to appellant's immediate left and the other slightly behind appellant and immediately to her right.
 {¶ 8} Appellant alleged that Hennebert is a large, strong man and that she was intimidated by his size and demeanor. She stated in her affidavit that Hennebert screamed at her and accused her of falsifying her time records. He pounded his fists on the table, berated her, used foul language, and stated that her actions constituted crimes and that she could go to jail. Appellant attempted to explain her actions but Hennebert called her a liar. Hennebert told appellant he was terminating her employment. Hennebert then offered appellant the option of resigning her job with six weeks severance pay or, if she refused, termination. According to appellant, she asked if she could leave the room to speak with someone about her options, but Hennebert screamed that she could not leave the room. Hennebert then purported to withdraw the offer of resignation and severance pay. Immediately thereafter, Hennebert barked at her to sign the resignation and to get her things and get out. Appellant alleged that Hennebert again yelled that she could not leave the conference room until she signed the resignation. Appellant signed the document and left the conference room. Farley did nothing and said *Page 4 
nothing during the meeting. Although appellant signed the resignation, she alleged that appellees fired her.
 {¶ 9} Essentially, appellant alleged that appellees fired her because: (1) she failed to incur sufficient compensatory time for use on political activities to benefit Recorder Montgomery; (2) she failed to demonstrate a sufficient commitment to Recorder Montgomery by performing political activities on his behalf both during and after her normal work hours; and (3) she failed to accurately record her time on her time sheet even though she recorded it as she had been instructed.
 {¶ 10} Appellees denied these allegations and alleged that appellant was discharged because she violated time clock procedures, falsified time records, and because she had ongoing absentee and tardiness problems.
 {¶ 11} After appellant filed her complaint, appellees filed a counterclaim for breach of contract and declaratory judgment, claiming that appellant breached the resignation contract. Appellees filed a motion for summary judgment on appellant's claims. The trial court denied the motion in part, but granted it with respect to appellant's false imprisonment claim against appellee Farley. The trial court scheduled the matter for a jury trial on the remaining claims.
 {¶ 12} Appellees then filed a motion for reconsideration of the trial court's denial of summary judgment. On August 10, 2006, the trial court referred the case to a visiting judge because the original trial court judge was engaged in trial.
 {¶ 13} On November 30, 2006, the trial court granted appellees' motion for reconsideration and granted judgment in appellees' favor on appellant's remaining claims. The trial court concluded that appellant's affidavit contradicted her deposition testimony. Therefore, the trial court did not consider appellant's affidavit. The trial court found that *Page 5 
appellant's deposition testimony failed to create a genuine issue of material fact and that appellees were entitled to judgment as a matter of law. Recorder Montgomery's counterclaims for breach of contract and declaratory judgment remained pending. The trial court's decision stated that "this is a final appealable order and there is no just reason for delay." Appellant now appeals assigning the following errors:
 1. The trial court erred in granting summary judgment upon reconsideration as to Appellant's wrongful termination claim.
 2. The trial court erred in granting summary judgment upon reconsideration as to Appellant's false imprisonment claim against Appellee Hennebert.
 3. The trial court erred in granting summary judgment as to Appellant's false imprisonment claim against Appellee Farley.
 {¶ 14} Appellees have filed a motion to dismiss this appeal for lack of jurisdiction. Article IV, Section 3(B)(2) of the Ohio Constitution limits our jurisdiction to the review of final orders. See Chef ItalianoCorp. v. Kent State Univ. (1989), 44 Ohio St.3d 86, 87; Grieshop v.Hoyng, Mercer App. No. 10-06-27, 2007-Ohio-2861. Therefore, as a threshold matter, we must determine whether the trial court's judgment is a final, appealable order.
 {¶ 15} A final and appealable order must meet the requirements of R.C.2505.02(B) and, if applicable, Civ.R. 54(B). See Chef ItalianoCorp. at 88. Civ.R. 54(B) provides:
 When more than one claim for relief is presented in an action whether as a claim, counterclaim, cross-claim, or third-party claim, and whether arising out of the same or separate transactions, or when multiple parties are involved, the court may enter final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay. In the absence of a determination that there is no just reason for delay, any order or other form of decision, however designated, which *Page 6 
adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties, shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.
 {¶ 16} Appellees rely on Miller v. First Internatl. Fid. TrustBldg., Ltd., 113 Ohio St.3d 474, 2007-Ohio-2457, for the proposition that if a counterclaim remains outstanding, the judgment appealed from is not a final, appealable order. In Miller, the Supreme Court of Ohio held that a journalized jury verdict is not a final, appealable order when a motion for prejudgment interest remains pending. We fail to see how Miller applies here. The case at bar involves neither a jury verdict nor a motion for prejudgment interest. The judgment at issue here disposed of all of appellant's claims pursuant to Civ.R. 56, leaving appellees' counterclaims for trial. Pursuant to Civ.R. 54(B), such a judgment is final as long as the trial court includes the critical Civ.R. 54(B) language. Here, the judgment contains the necessary language, and thus it falls squarely within the scope of Civ.R. 54(B). To apply Miller as appellees argue would render Civ.R. 54(B) meaningless. Accordingly, we deny appellees' motion to dismiss.
 {¶ 17} Because appellant's claims were decided on summary judgment, our review is de novo. Koos v. Cent. Ohio Cellular, Inc. (1994),94 Ohio App.3d 579, 588. As such, we stand in the shoes of the trial court and conduct an independent review of the record.
 {¶ 18} Civ.R. 56(C) states that summary judgment shall be granted if:
 * * * [T]he pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Page 7 
Accordingly, summary judgment is appropriate only where: (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. Tokles Son, Inc. v. Midwestern Indemn. Co. (1992),65 Ohio St.3d 621, 629, citing Harless v. Willis Day Warehousing Co. (1978),54 Ohio St.2d 64. "The moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim."Dresher v. Burt (1996), 75 Ohio St.3d 280, 293.
 {¶ 19} In her first assignment of error, appellant contends that the trial court erred in granting summary judgment on her claim for wrongful discharge in violation of public policy. We disagree.
 {¶ 20} Traditionally, an employer could terminate the employment of any at-will employee for any cause, at any time whatsoever, even if the termination was done in gross or reckless disregard of the employee's rights. Phung v. Waste Mgt, Inc. (1986), 23 Ohio St.3d 100, 102. The Supreme Court of Ohio has described an employment at-will relationship as one in which:
 "`[T]he employee agrees to perform work under the direction and control of the employer, and the employer agrees to pay the employee at an agreed rate. Moreover, either an employer or an employee in a pure at-will employment relationship may legally terminate the employment relationship at any time and for any reason.'"
Leininger v. Pioneer Natl. Latex, 115 Ohio St.3d. 311, 2007-Ohio-4921, at ¶ 6, quoting Mers v. Dispatch Printing Co. (1985), 19 Ohio St.3d 100,103. *Page 8 
 {¶ 21} However, in Greeley v. Miami Valley Maintenance Contractors,Inc. (1990), 49 Ohio St.3d 228, at paragraphs one and two of the syllabus, the Supreme Court of Ohio recognized an exception to the employer's plenary right to terminate an employee's employment: an employer may not discharge an employee in violation of public policy. Accordingly, Greeley held that "[p]ublic policy warrants an exception to the employment at-will doctrine when an employee is discharged or disciplined for a reason which is prohibited by statute." Id., at paragraph one of the syllabus. If an employer does so, the discharged employee can bring a cause of action in tort against the employer. Id., at paragraph three of the syllabus; White v. Sears Roebuck Co.,163 Ohio App.3d 416, 2005-Ohio-5086.
 {¶ 22} In Painter v. Graley (1994), 70 Ohio St.3d 377, at paragraph three of the syllabus, the Supreme Court of Ohio extendedGreeley to claims of wrongful discharge for employment terminations that violate public policy as expressed in sources other than the Ohio Revised Code. The court stated that:
 "Clear public policy" sufficient to justify an exception to the employment-at-will doctrine is not limited to public policy expressed by the General Assembly in the form of statutory enactments, but may also be discerned as a matter of law based on other sources, such as the constitutions of Ohio and the United States, administrative rules and regulations, and the common law.
Painter, at paragraph three of the syllabus; see, also,Leininger, at ¶ 8.
 {¶ 23} To assert a viable claim for wrongful discharge in violation of public policy, a plaintiff must establish each of the following four elements:
 1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element). *Page 9 
 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).
 3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).
 4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).
Painter, at 384 (emphasis omitted); Collins v. Rizkana (1995),73 Ohio St.3d 65, 69-70; Leininger, at ¶ 9-12.
 {¶ 24} The clarity and jeopardy elements involve relatively pure law and policy decisions and thus, constitute questions of law to be determined by the court. Collins, at 70; Leininger, at ¶ 13. The causation and overriding business justification elements typically present issues of fact for the trier of fact to decide.Collins, at 70.
 {¶ 25} We first address the clarity element. For a "common-law claim for wrongful discharge, a plaintiff must prove the clarity element by showing that a clear public policy is manifested in the state or federal constitutions, or in a statute, administrative regulation, or the common law." Leininger, at ¶ 16. Here, appellant relied upon R.C. 2913.02(A)(3) (theft by deception), R.C. 3517.092(D)(3) (improper solicitation of campaign contributions), and R.C. 3517.092(F)(2) (improper solicitation of contributions from a public employee performing official duties) as the basis for her claim of wrongful termination in violation of public policy.
 {¶ 26} R.C. 2913.02(A)(3) provides that:
 (A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
 * * * *Page 10 
 (3) By deception[.]
The public policy articulated in R.C. 2913.02(A)(3) is clear. It is against public policy for a person to deprive the owner of property or services by knowingly obtaining or exerting control over said property or services by deception. Here, appellant alleged that appellees engaged in a scheme to encourage and facilitate their employees' illegal accumulation of compensatory time for later use on political activities. To understand why this alleged scheme implicates the public policy behind R.C. 2913.02(A)(3), it is necessary to understand the concept of compensatory time.
 {¶ 27} Generally, compensatory time is accrued by a public employee when he or she works more than the required hours during a given pay period. A public employee can use accrued compensatory time as paid time off work. Therefore, a public employee's utilization of compensatory time during normal working hours results in the public entity paying his or her regular wages even though the public employee was not actually working.
 {¶ 28} Although the utilization of improperly accumulated compensatory time does not directly deprive the public entity of property or services, we nevertheless conclude that R.C. 2913.02(A) manifests a clear public policy prohibiting public employers or employees from committing theft by using public funds, either directly or indirectly, to pay employees for activities unrelated to their employment. SeeState v. Brumback (1996), 109 Ohio App.3d 65 (school district treasurer convicted of theft in office and theft by deception for reimbursing herself for mileage that she had not driven); State v. Dragoo (1981),65 Ohio St.2d 88 (state employee convicted of theft in office and theft by deception for submitting false daily reports and false travel expense reports). Therefore, *Page 11 
we conclude that appellant's reliance on R.C. 2913.02(A)(3) satisfies the clarity element of a wrongful discharge claim based on public policy.
 {¶ 29} Appellant also alleges that her discharge violated the public policy set forth in R.C. 3517.092(D)(3) (improper solicitation of campaign contributions) and R.C. 3517.092(F)(2) (improper solicitation of contributions from a public employee performing official duties.)[1] R.C. 3517.092(D)(3) provided that:
 (D) No county elected officer, no campaign committee of such an officer, and no other person or entity shall knowingly solicit a contribution on behalf of that officer or that officer's campaign committee from any of the following:
 * * *
 (3) A county employee who functions in or is employed in or by the same public agency, department, division, or office as the county elected officer.
R.C. 3517.092(F)(2) provided that:
 No person shall solicit a contribution from any public employee while the public employee is performing the public employee's official duties or is in those areas of a public building where official business is transacted or conducted.
 {¶ 30} Cases interpreting the constitutionality of the statutes prohibiting solicitation of political contributions from a public employee while the employee is performing official duties state that the statutes advance the policy of increasing public worker efficiency, decrease the role of politics in the provision of public services, promote bipartisan public support of government, and reduce partisan pressure on public employees. United Auto Workers, Local Union 1112 v.Philomena (1998), 121 Ohio App.3d 760; Toledo Area AFL-CIO Council v.Pizza (N.D.Ohio 1995), 898 F.Supp. 554. *Page 12 
 {¶ 31} Appellant alleges that by soliciting employees to improperly accrue compensatory time for later use on political activities, appellees were effectively soliciting campaign contributions in an amount representing the value of the compensatory time ultimately used by the employee to perform the political activities. We agree with appellant that R.C. 3517.092(D)(3) and 3517.092(F)(2) manifest a clear public policy prohibiting the solicitation of campaign contributions from county employees. This public policy would include the prohibition against soliciting campaign contributions from county employees through the scheme alleged by appellant. Therefore, appellant's reliance upon R.C. 3517.092(D)(3) and 3517.092(F)(2) also satisfies the clarity element.
 {¶ 32} We next turn to the jeopardy element. When analyzing the jeopardy element, a court must inquire "into the existence of any alternative means of promoting the particular public policy to be vindicated by a common-law-wrongful-discharge claim." Wiles v. MedinaAuto Parts, 96 Ohio St.3d 240, 2002-Ohio-3994, at ¶ 15, citingPerritt Employee Dismissal Law and Practice (4th Ed. 1998), 44, Section 7.17; White, supra, at ¶ 24. Simply put, there is no need to recognize a common law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests by discouraging the wrongful conduct. Leininger, at ¶ 26-27. Therefore, to satisfy the jeopardy element, appellant must prove that without a common law tort claim for wrongful discharge, the public policies advanced by R.C. 2913.02(A)(3) (theft by deception), R.C.3517.092(D)(3) (improper solicitation of campaign contributions) and R.C. 3517.092(F)(2) (improper solicitation of contributions from a public employee performing official duties) would be compromised.Leininger, at ¶ 21.
 {¶ 33} With respect to the public policy embodied in R.C.2913.02(A)(3), there are significant civil and criminal remedies in place to protect society's interest. First, the *Page 13 
scheme alleged by appellant would constitute a conspiracy/corrupt activity violation under R.C. 2923.01. In addition, the scheme would violate Ohio's RICO statute. R.C. 2923.32(A)(1).
 {¶ 34} R.C. 2923.32(A)(1) provides that no person associated with an enterprise shall engage in corrupt activity. "Enterprise" is defined to include "any individual," "government agency," or "group of persons associated in fact." R.C. 2923.31(C). "Corrupt activity" is defined as:
 [E]ngaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in any of the following:
 * * *
 (c) Any violation of section * * * 2913.02 * * *
R.C. 2923.31(I)(2)(c). A "pattern of corrupt activity" means essentially two or more incidents of corrupt activity that are related to the affairs of the same enterprise. R.C. 2923.31(E). The scheme alleged by appellant would constitute multiple incidents of theft by deception under R.C. 2913.02 and, therefore, would also constitute a pattern of corrupt activity. In addition to potential incarceration, the violation of R.C. 2923.32 could result in the imposition of significant penalties including: (1) a fine not exceeding the greater of three times the gross value gained or three times the gross loss caused; (2) court costs; (3) costs of investigation and prosecution that are reasonably incurred; and (4) forfeiture of any property used in furthering the scheme and any proceeds derived from the corrupt activity. Lastly, R.C. 2923.34 grants a person who is injured by a violation of R.C. 2923.32 a civil remedy including treble damages, injunctive relief and attorneys fees. R.C.2923.34(E) and (F). *Page 14 
 {¶ 35} Second, depending upon the value of the property or services stolen, the violation of R.C. 2913.02(A)(3) alleged by appellant would constitute anywhere from a first degree misdemeanor to a first degree felony. R.C. 2913.02(B)(2). Sanctions for a violation of R.C.2913.02(A)(3) include incarceration, community control and/or fines. Considering both the civil and criminal remedies available for a violation of R.C. 2913.02(A)(3), the existing statutory framework sufficiently protects society's interest. Therefore, there is no need to recognize a common law action for wrongful discharge in violation of public policy under these circumstances.
 {¶ 36} We reach the same conclusion with respect to appellant's reliance on R.C. 3517.092 as the basis for her wrongful discharge in violation of public policy claim. The General Assembly has devised an extensive regulatory system for addressing alleged election law violations, including illegal solicitations of campaign contributions from public employees. Ohio law grants the Ohio Election Commission authority to impose civil fines and penalties for violations of R.C.3517.092. See R.C. 3517.992(M) and (Z). The violation of R.C. 3517.092
is also a first degree misdemeanor and subjects the violator to potential incarceration as well as a criminal fine. Regulatory oversight, civil penalties, and criminal sanctions are sufficient to protect the public interest embodied in R.C. 3517.092. Therefore, there is no need to recognize a common law tort action for wrongful discharge in violation of public policy.
 {¶ 37} The case at bar is analogous to Jurczak v. J R SchugelTrucking Co., Franklin App. No. 03AP-451, 2003-Ohio-7039, wherein the plaintiff asserted that Ohio criminal law manifested a clear public policy prohibiting individuals under the influence of narcotic drugs from operating a motor vehicle. The plaintiff argued that this public policy would be jeopardized if he could not bring a claim for wrongful discharge in violation of *Page 15 
public policy against his employer for allegedly discharging him for refusing to work when he was ill and on a narcotic medication. We disagreed. Because federal law imposed civil and criminal penalties on employers who required an employee to drive a commercial motor vehicle while taking a narcotic medication, this court found that adequate statutory remedies existed promoting the public policy at issue. Id., at ¶ 35. See, also, White (regulatory oversight and civil and criminal penalties contained in the Ohio Minimum Wage Standards Act, R.C. Chapter 4111 et seq., and the Fair Labor Standards Act, Section 201 et seq., Title 29, U.S. Code, adequately protected society's interests and, therefore, the employee's dismissal did not jeopardize the public policy).
 {¶ 38} Because we have concluded as a matter of law that appellant has not satisfied the jeopardy element of her wrongful discharge in violation of public policy claim, further analysis of the causation and justification elements is unnecessary. Therefore, we overrule appellant's first assignment of error.
 {¶ 39} In her second assignment of error, Ripley contends that there are genuine issues of material fact that preclude summary judgment in favor of appellee Hennebert on her claim for false imprisonment. The tort of false imprisonment arises when one is confined intentionally, for any appreciable time, against his will and without lawful justification. Feliciano v. Kreiger (1977), 50 Ohio St.2d 69, 71;Mullins v. Rinks, Inc. (1971), 27 Ohio App.2d 45, 56. In an action for false imprisonment, the plaintiff need only demonstrate that he was deprived of his liberty. The presumption then arises that the restraint was unlawful, and it is incumbent on the defendant to show legal justification. Isaiah v. Great Atlantic Pacific Tea Co. (1959), 111 Ohio App. 537.
 {¶ 40} Where a plaintiff does not offer proof of confinement, the cause of action fails as a matter of law. Witcher v. Fairlawn (1996),113 Ohio App.3d 214, 217. There is *Page 16 
no confinement when a person voluntarily appears at a premise and is free to leave. Walden v. General Mills Restaurant Group, Inc. (1986),31 Ohio App.3d 11, 15. Mere submission to verbal direction in the absence of force or threat of force does not constitute confinement or detention. Branan v. Mac Tools, Franklin App. No. 03AP-1096,2004-Ohio-5574, at ¶ 32; Condo v. B R Tire Co. (May 29, 1996), Mahoning App. No. 95 C.A. 166. Further, "`there is no false imprisonment where an employer interviewing an employee declines to terminate the interview if no force or threat of force is used, and false imprisonment may not be predicated on a person's unfounded belief that he was restrained.'" Branan, at ¶ 32, quoting Kinney v. Ohio Dept. of Admin.Serv. (Aug 30, 1988), Franklin App. No. 88AP-27. The determination of whether the plaintiff was falsely imprisoned presents a mixed question of law and fact: a legal question arises as to what facts state a claim for false imprisonment, and the question of whether those facts existed is for the trier of fact. Bronaugh v. Harding Hosp., Inc. (1967),12 Ohio App.2d 110, 120.
 {¶ 41} In granting summary judgment for Hennebert, the trial court refused to consider appellant's affidavit because it found that the affidavit conflicted with appellant's deposition testimony. Based upon our review of appellant's deposition testimony and her affidavit, we fail to find a direct conflict. The affidavit merely amplified some of the statements appellant made in her deposition. See Byrd v. Smith,110 Ohio St.3d 24, 2006-Ohio-3455 (when determining the effect of a party's affidavit that appears to be inconsistent with the party's deposition and that is submitted either in support of or in opposition to a motion for summary judgment, a trial court must consider whether the affidavit contradicts or merely supplements the deposition). Although there are statements in appellant's affidavit that were not clearly stated in her deposition testimony, appellant's affidavit does not contradict her deposition testimony. Therefore, unlike the *Page 17 
trial court, we will consider appellant's affidavit in addressing her claim for false imprisonment.
 {¶ 42} The essential facts appellant alleges in support of her false imprisonment claim against Hennebert are set forth in paragraphs 41 through 53 of her affidavit. Appellant alleges as follows:
 41. Suddenly, on May 18, 2004, I reported for work at my normal start time of 8:30 a.m. and found my desk in complete disarray. My computer equipment had been unplugged and moved. I immediately sought an IT person to determine if there was an issue with my computer.
 42. As I walked away from my desk, Mr. Hennebert abruptly approached me and demanded "we need to have a meeting." Mr. Hennebert led me to the conference room where Mr. Farley, another supervisor, was waiting.
 43. Mr. Hennebert slammed the conference room door closed and had me sit between him and Mr. Farley. Mr. Hennebert is a large man who lets everyone know about his weight lifting abilities. I was extremely intimidated by him during this meeting because in the past I had heard him direct his anger toward other employees and it was extremely frightening. After I sat down, Mr. Hennebert proceeded to scream at me, pound his fists on the table, used foul language and berated me. He even threatened me with criminal acts and that I would go to jail. Mr. Hennebert knew I am a single mother and I always put my son first.
 44. While I was confined in the conference room, Mr. Hennebert read from a file he identified as his version of my personnel file. This file included documents purporting to identify dates that I was allegedly late for work, left early, and/or left the floor without clocking out. The file also included an alleged copy of the e-mail I sent to payroll regarding clocking out for the May 12, 2004 fundraiser.
 45. I requested to see the documents in the file to understand why Mr. Hennebert was so angry. Mr. Hennebert barked back "I don't have to show you a God damn thing!" Hennebert then threw the time card policy at me screaming "You should know the policy, you passed the God damn thing out!" *Page 18 
 46. I attempted to question the records. I explained that I did not clock out when I was off the floor performing my job duties, including getting Mr. Montgomery's meals, and that I was instructed to have payroll manually clock me out at 5:00 p.m. for the May 12, 2004 fundraiser.
 47. Mr. Hennebert did not let me finish my explanations and accused me of being a liar. During this entire time, Mr. Hennebert was screaming at me, throwing things, and pounding his fists on the table. Mr. Farley did nothing to allow me to leave or to stop Mr. Hennebert.
 48. I was threatened and intimidated by Mr. Hennebert's berating statements, demeanor, and tone. I was not permitted to leave the conference room and was forced to listen to Mr. Hennebert's accusations and threats that I lied and committed fraud and theft.
 49. After Mr. Hennebert finished his tirade, he advised me that I was being terminated. At this time I was given the option of being terminated or signing a resignation. Defendants knew that I am a single mother who needed income and benefits to support my son. I asked to leave the room so that I could consider my options and speak with someone. Mr. Hennebert screamed that I could not leave the room and Mr. Farley did not permit me to leave the room.
 50. Again, Mr. Hennebert began to scream and threaten me. However, Mr. Hennebert withdrew his offer to allow me to choose to resign or be terminated. Mr. Hennebert yelled that I could not leave the conference room until I signed the purported resignation. When I did not immediately sign the resignation, Mr. Hennebert barked at me to sign the document, get my things and get out.
 51. Mr. Hennebert and Mr. Farley continued to confined [sic] me in the conference room until I signed the document. Knowing that I could not leave until I signed the document, I reluctantly signed the document.
 52. Mr. Hennebert then summoned another employee, Curtis Johnson, to immediately escort me to her [sic] desk, watch me collect her [sic] personal belongings, and escort me to the elevators. *Page 19 
 53. During this entire time, I was completely distraught and crying to leave the conference room. Despite my requests, Mr. Hennebert and Mr. Farley refused to permit me to leave the conference room.
(Ripley affidavit at paragraphs 41through 53.)
 {¶ 43} As previously noted, submission to mere verbal direction of another, unaccompanied by force or threat of force, cannot constitute false imprisonment. Branan, supra, at ¶ 32. The key issue here is whether appellant alleged facts indicating that Hennebert used force or threat of force to confine her in the conference room. Essentially, appellant contends that she established force or threat of force alleging that: (1) Hennebert is a large and powerfully built man; (2) Hennebert slammed the door as they entered the conference room; (3) Hennebert screamed at her, pounded his fist on the table, used foul language, and berated her during the course of the meeting; (4) Hennebert threatened her with criminal prosecution for her alleged misconduct; (5) Hennebert denied appellant's request to leave the conference room to consult with someone about his offer to let her resign in lieu of being terminated; and (6) Hennebert yelled that she could not leave the conference room until she signed the resignation.
 {¶ 44} We must consider appellant's allegations in the context of other undisputed facts. The meeting took place during normal office hours in an office conference room located within the county recorder's office. After entering the conference room, appellant was seated at the head of the table with Hennebert sitting around the table to her right and Farley sitting around the table to her left. There were two doors to the conference room: one to appellant's immediate left and the other slightly behind appellant and to her immediate right. Appellant did not allege that the conference room doors were locked, nor did appellant dispute Hennebert's testimony that the doors to the conference room did *Page 20 
not lock. Both Hennebert and Farley remained seated throughout the meeting and they made no attempt to obstruct appellant's path to either door in the conference room. At no time did appellant attempt to leave the conference room. Nor did appellant allege that Hennebert or Farley threatened to physically prevent her from leaving the conference room. In fact, appellant alleged that Hennebert told her to sign the resignation and to get out. Lastly, it is undisputed that appellant signed the resignation and immediately left the conference room.
 {¶ 45} Viewing appellant's allegations in the context of these undisputed facts, we conclude that Hennebert is entitled to judgment as a matter of law. Appellant's allegations establish only that she submitted to the verbal direction of her supervisor to remain in the conference room. A termination meeting, particularly one where there are allegations of misconduct by the employee, is likely to be tense and potentially contentious. We recognize that an employee may not feel completely free to walk out of a meeting with his or her supervisor under these circumstances. Nevertheless, appellant's allegations establish only that she submitted to the verbal direction of her supervisor during what was obviously a stressful and uncomfortable meeting. Although appellant may have felt intimidated by Hennebert's demeanor and tone, appellant has not presented evidence that she was confined by force or threat of force. Construing the evidence in the light most favorable to appellant, and making reasonable inferences in her favor, we conclude that appellant has failed to set forth a sufficient factual basis for a claim of false imprisonment against Hennebert. Therefore, we overrule appellant's second assignment of error.
 {¶ 46} In her third assignment of error, appellant asserts the trial court erred in granting summary judgment in favor of appellee Farley on her claim for false *Page 21 
imprisonment. The trial court found that Farley took no role in the alleged confinement, and therefore, was entitled to judgment as a matter of law. We agree.
 {¶ 47} Based on appellant's own deposition testimony, Farley did not speak to her, did not question her, and did not attempt to confine her. He was present in the conference room when Ripley and Hennebert entered, and he merely sat at the conference table and did nothing. Appellant testified in her deposition that the basis for her claim against Farley was that he did not intervene to stop the confrontation. Appellant makes essentially the same allegations in her affidavit when she states that Farley "did nothing to allow her to leave or to stop Hennebert." These allegations fail to state a claim against Farley for false imprisonment.
 {¶ 48} Appellant argues that state actors who are present during the violation of a person's civil rights, can be liable under Section 1983, Title 42, U.S. Code, for their inaction. See, e.g., Smith v. Heath
(C.A.6, 1982), 691 F.2d 220, 224-225; Mick v. Brewer (C.A.10, 1996), 76 F.3d 1127, 1136; O'Neill v. Krzeminski (C.A.2, 1988), 839 F.2d 9, 11;Fundiller v. Cooper City (C.A.11, 1985), 777 F.2d 1436, 1441-1442. Thus, by analogy, appellant contends that she has a claim for false imprisonment against Farley due to his failure to intervene.
 {¶ 49} The cases relied upon by appellant are distinguishable because they were all brought under federal civil rights statutes and involved law enforcement personnel failing to prevent the use of excessive force by other officers. The tort of false imprisonment in Ohio has never been interpreted to impose liability for mere inaction. Moreover, given our resolution of appellant's second assignment of error, Farley could not be liable for failing to prevent conduct that did not violate appellant's rights. Therefore, we *Page 22 
conclude that appellant failed to state a claim against Farley for false imprisonment, and we overrule appellant's third assignment of error.
 {¶ 50} Having overruled appellant's three assignments error, we affirm the judgment of the Franklin County Court of Common Pleas.
Motion to dismiss denied; judgment affirmed.
FRENCH and DESHLER, JJ., concur.
DESHLER, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
[1] R.C. 3517.092 was amended effective May 2, 2006. The General Assembly re-wrote this section and changed the designation of the subdivisions at issue here to R.C. 3517.092(C)(1) and 3517.092(D)(2) respectively. *Page 1